966 F.2d 403
 35 Fed. R. Evid. Serv. 1272
 UNITED STATES of America, Appellee,
v.
Floyd Alvin ENGLAND, Appellant.
UNITED STATES of America, Appellee,
v.
Chris A. TERRELL, Appellant.
UNITED STATES of America, Appellee,
v.
Myles CURTIS, Appellant.
UNITED STATES of America, Appellee,
v.
David L. MOSBY, Appellant.
UNITED STATES of America, Appellee,
v.
Ronnie D. PEACOCK, Appellant.
 Nos. 91-2128, 91-2129, 91-2248, 91-2249, 91-2251.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 9, 1991.
Decided June 8, 1992.
Rehearing and Rehearing En Banc
Denied July 29, 1992.
 
 Thomas A. Ludwig (argued), Jackson, Mo., for appellant England.
 John T. Welch, Malden, Mo., for appellant Terrell.
 Daniel P. Reardon, Jr., Clayton, Mo., for appellant Curtis.
 Alan Jay Koshner, St. Louis, Mo., for appellant Mosby.
 George W. Gilmore, Jr., Sikeston, Mo., for appellant Peacock.
 Edward J. Rogers (argued), Asst. U.S. Atty., St. Louis, Mo., for appellee.
 Before ARNOLD, Circuit Judge,* BRIGHT, Senior Circuit Judge, and FAGG, Circuit Judge.
 ARNOLD, Chief Judge.
 
 
 1
 Floyd England, Chris Terrell, Myles Curtis, David Mosby, and Ronnie Peacock appeal their convictions and sentences for conspiring to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846. We affirm both the convictions and the sentences.
 
 I.
 
 2
 Beginning at some point in 1985, Jerry Duncan, a member of the Pharaohs Motorcycle Club, began selling methamphetamine in and around Poplar Bluff, Missouri. Although not his original source, beginning in 1987, Duncan began receiving methamphetamine from Cecil Summerfield, from whom the Pharaohs rented their clubhouse. Cecil's half-brother, Jack Summerfield, manufactured the methamphetamine. With the methamphetamine Duncan received from Cecil, he, in turn, supplied several other members of the Pharaohs--Calvin Morley, Chris Terrell, Rodney Jackson, Myles Curtis, Floyd England, and Charles Lanny Robinson--with the drug for resale. While they did not get their methamphetamine directly from Duncan (they got it from Curtis), two other individuals associated with the Pharaohs--Ronnie Peacock and David Mosby--also began distributing the Summerfields' methamphetamine. Duncan also provided Gary Deering, a member of another motorcycle club, with methamphetamine for resale.
 
 
 3
 In early 1989, law enforcement officers arrested Jack Summerfield and shut down his methamphetamine factory. In response, England developed another source of methamphetamine. Additionally, throughout 1989, Cecil Summerfield attempted to generate another source of methamphetamine by making several trips to California with his uncle, Calvin Harold Clark. In February 1990, they found a source in California, bought some methamphetamine, and brought it back to Missouri for resale. Summerfield and Clark contacted Duncan to help distribute the methamphetamine they purchased in California.
 
 
 4
 Unknown to them or others involved in the prior methamphetamine sales, however, Duncan had begun cooperating with the police in December 1989 after being arrested. With the consent of federal agents, Duncan agreed to help Summerfield and Clark distribute their newly acquired methamphetamine. On March 7, 1990, federal agents tape recorded conversations between Duncan, Curtis, Peacock, England, and Terrell in which they discussed future distribution of the new methamphetamine. Duncan recorded another similar conversation between himself and Mosby on March 10, 1990. On March 13, 1990, federal agents arrested Cecil Summerfield and Clark as they delivered four pounds of methamphetamine to Duncan. That same day, agents arrested England, Curtis, Mosby, and Terrell as they attempted to pick up their scheduled delivery of methamphetamine. After agents executed a search warrant at Peacock's home, he surrendered.
 
 
 5
 On October 12, 1990, a grand jury sitting in the Eastern District of Missouri returned a second superseding indictment against the defendants. In Count I, the indictment charged that the defendants, along with Cecil Summerfield, Calvin Harold Clark, Danny R. Walker, and Charles Lanny Robinson, conspired from late 1985 to March 13, 1990, to distribute cocaine and methamphetamine in southeastern Missouri and elsewhere. In separate counts, each of the defendants was also charged individually with using a firearm in connection with a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1). Before trial, Clark, Walker, and Robinson agreed to cooperate with the government and testify on its behalf. Summerfield pleaded guilty, but did not testify.
 
 
 6
 After a seven-day trial ending on February 5, 1991, the jury found each defendant guilty of conspiracy, but acquitted each of them on the firearms charges. On May 10, 1991, the District Court[1] sentenced defendants England, Terrell, Curtis, and Mosby to forty years' imprisonment to be followed by five years of supervised release. Peacock received a sentence of 17 1/2 years' imprisonment to be followed by five years of supervised release. The Court also imposed a special assessment of fifty dollars against each defendant. These appeals followed.
 
 II.
 
 7
 All the defendants argue that their convictions are supported by insufficient evidence. After reviewing the evidence in the light most favorable to the government, we believe a reasonable jury could find each of the defendants guilty of conspiracy beyond a reasonable doubt. We reject their claim that the government's main witness, Duncan, was not credible and that his testimony cannot support their convictions because much of it was uncorroborated. Defense counsel strenuously cross-examined Duncan. The jury was aware of his cooperation with the government and of his role in the conspiracy. The District Court also admonished the jury to examine the testimony of an informer with greater care than other witnesses. Despite this information, the jury apparently believed, and was entitled to believe, Duncan.
 
 
 8
 The defendants' next contention is that their convictions must be reversed because the government proved multiple conspiracies instead of the single conspiracy alleged in the indictment. They claim that the government proved at least two, and maybe three, conspiracies: the first conspiracy beginning in 1985 or 1986 and ending with Jack Summerfield's arrest in early 1989; the second conspiracy stemming from England's alternative source of methamphetamine; and the third conspiracy beginning in February 1990 with the plans to distribute the methamphetamine Cecil Summerfield and Clark bought in California.
 
 
 9
 Whether the government has proved a single conspiracy or a multiple conspiracy is a question of fact to be resolved by the jury. See, e.g., United States v. Springer, 831 F.2d 781, 784 (8th Cir.1987), cert. denied, 485 U.S. 938, 108 S.Ct. 1117, 99 L.Ed.2d 277 (1988). Our review of the record, in the light most favorable to the verdict, indicates that it was reasonable for the jury to conclude that a single conspiracy existed. The essence of a drug conspiracy is an agreement to violate the narcotics laws. Evidence in this case indicates that the defendants had one common overall goal--to distribute methamphetamine. The fact that they may not have had drugs to distribute for periods of time does not mean that they were no longer conspiring to distribute methamphetamine. Indeed, the evidence indicates that the network continued to seek a source during these "dry" times, and that it was ready to distribute the drugs once they became available.
 
 
 10
 Defendant Mosby argues that the District Court erred by admitting certain hearsay statements into evidence. He challenges the admission of out-of-court statements made by Daniel Byrd and Curtis which implicated him as well as admission of his tape-recorded conversation with Duncan. He claims the government failed to demonstrate by a preponderance of the evidence under Rule 801(d)(2)(E) that these statements were made by co-conspirators during the course and in furtherance of the conspiracy. We reject Mosby's claims.
 
 
 11
 The statements Mosby challenges simply do not present Rule 801(d)(2)(E) problems. Duncan testified that Curtis was his connection to Mosby in their drug-distribution network. While Curtis may have told Duncan that he was distributing drugs to Mosby--an out-of-court statement--Duncan's trial testimony on this point does not repeat an out-of-court statement. The Assistant United States Attorney asked Duncan who his connection was to Mosby. Duncan replied, "Myles Curtis." Trial Transcript at 384. No hearsay is recounted in this testimony. Similarly, the tape-recorded conversation between Duncan and Mosby does not present a Rule 801(d)(2)(E) problem. Mosby's statements are his own admissions and are therefore admissible under Rule 801(d)(2)(A).
 
 
 12
 Mosby does not identify with any particularity statements made by Byrd which were improperly admitted under Rule 801(d)(2)(E). It is true that Byrd's testimony does contain some hearsay. He testified, for example, that he told Drug Enforcement Administration agents that an individual named Ricky Drake was his source and that the agents, in turn, told him to wear a wire when making future purchases from Drake. We agree that these statements were not admissible under Rule 801(d)(2)(E). Nevertheless, we see no prejudice to Mosby or any of his co-defendants due to their admission. As for Byrd's testimony which did implicate Mosby, it simply contains no hearsay and therefore does not support Mosby's claim of prejudicial error.
 
 
 13
 We also reject defendant Terrell's related claim that the District Court erred in admitting co-conspirator statements by failing to comply with this Court's decision in United States v. Bell, 573 F.2d 1040, 1044 (8th Cir.1978). Bell requires district courts to admit conditionally the statements of co-conspirators, subject to the government's meeting its burden of proving that it is more likely than not that the statements were made by a co-conspirator during the course and in furtherance of the conspiracy. At the close of the evidence, Bell requires the district court to make an explicit on-the-record ruling that the government has met its burden. If the court concludes the government has not met its burden, it must either issue a cautionary instruction to the jury or declare a mistrial.
 
 
 14
 In analyzing this claim, we address only Terrell's claim that the District Court failed to comply with the procedure outlined in Bell. We do not consider whether the Court erred in admitting particular co-conspirator statements. We follow this course because Terrell has not identified with specificity the statements he claims were inadmissible. Apparently, the government's attempt to introduce co-conspirator statements had been the subject of a pre-trial conference. Consequently, at the beginning of the trial, the District Court decided to admit conditionally all co-conspirator statements being offered into evidence by the government. At the close of the government's case, the Court made an explicit on-the-record ruling that the government had met its burden and that the challenged statements were admissible. Id. at 738-39. Thus, the District Court substantially followed the Bell procedure. That is all our cases require. See, e.g., United States v. Coco, 926 F.2d 759, 761 (8th Cir.1991).
 
 
 15
 Mosby claims that the District Court prejudiced his defense and therefore abused its discretion by failing to grant his motion to sever his trial from that of his co-defendants. We disagree. In the main, this Circuit prefers that conspiracy defendants be tried together, particularly when the government's case against each defendant is based on the same evidence. See, e.g., United States v. White, 890 F.2d 1012, 1016 (8th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3254, 111 L.Ed.2d 763 (1990). Nothing in the record before us indicates that this general practice should not have been followed in this case. Mosby was the only defendant who testified. His defense was a blanket denial of all involvement in the conspiracy. This defense was not inconsistent with the defenses of his co-defendants, who also denied committing any crime. Contrary to his assertion, there is no evidence that the jury was not able to compartmentalize the evidence against each defendant, including Mosby. The District Court properly instructed the jury to consider the evidence against each defendant individually. We see no reason to believe that the jury did not follow this instruction.
 
 
 16
 Defendant England claims that the District Court erred by reading the indictment to the jurors and sending a copy of it into the jury room with them. The indictment contained allegations that England had performed several overt acts in furtherance of the conspiracy. Among these overt acts were claims that on or about July 11, 1988, and March 9, 1989, England "possessed methamphetamine and drug paraphernalia, among other items." England's Appendix 39. The Court's reading of the indictment prejudiced England, he asserts, because the government did not present any evidence concerning these two overt acts. In fact, the District Court suppressed evidence tending to prove that England possessed methamphetamine and drug paraphernalia on July 11, 1988, because it had been seized in violation of the Fourth Amendment.
 
 
 17
 As a preliminary matter, we note that reading and submitting the indictment to the jury is not improper per se. See, e.g., United States v. Wagoner, 713 F.2d 1371, 1377-78 (8th Cir.1983). Where the government has not presented evidence supporting allegations in the indictment, however, the "better course" is to redact those allegations from the indictment. United States v. Parker, 586 F.2d 1253, 1257 (8th Cir.1978). With respect to the allegation supported by evidence explicitly excluded from the government's case, not only was redaction the better course, it was required.
 
 
 18
 Despite the existence of this error, however, we will reverse on this basis only if England suffered prejudice as a result. Parker, 586 F.2d at 1257. We see no prejudice here. Although the parties appear to be confused on this point, the law is clear that in order to obtain a conviction under 21 U.S.C. § 846, the government is not required to prove an overt act in furtherance of the conspiracy. See, e.g., United States v. Covos, 872 F.2d 805, 810 (8th Cir.), cert. denied, 493 U.S. 840, 110 S.Ct. 124, 107 L.Ed.2d 85 (1989). The fact that the government did not need to prove any overt acts, including this particular overt act, to win its case would end the matter, except that everyone below--the parties, the District Court, and the jury--apparently thought proof of an overt act was required. The issue, then, is whether the jury impermissibly relied on the July 11, 1988, allegation to convict England. We think it did not. The District Court admonished the jury at least twice that allegations contained in the indictment were not evidence. We have no reason to believe the jury did not follow this instruction. Moreover, the indictment alleged that England committed several overt acts for which the government presented evidence. No reversible error occurred when the District Court read the indictment to the jury.
 
 
 19
 The defendants' remaining claims are without merit. We affirm their convictions for conspiracy to distribute methamphetamine.
 
 III.
 
 20
 In addition to challenging their convictions, each of the defendants also attacks the sentence he received under the Sentencing Guidelines.[2] With the exception of Peacock, the defendants claim that the District Court erred in calculating their base offense level. The District Court assigned these four defendants a base offense level of 38 by attributing sixty-nine pounds, or approximately 31 kilograms, of methamphetamine to each of them. See U.S.S.G. § 2D1.1(c)(3) (assigning a base offense level of 38 for at least 30, but less than 100, kilograms of methamphetamine). The sixty-nine pounds included four pounds of methamphetamine seized by the government on March 13, 1990, and sixty-five pounds of methamphetamine Duncan estimated that he received from Summerfield from 1987 to 1989. The defendants claim that only the four pounds of methamphetamine seized by the government and introduced into evidence at the trial should be used to calculate their base offense level.[3] We disagree.
 
 
 21
 The District Court is permitted to estimate the amount of drugs involved in the conspiracy. The Sentencing Guidelines provide that "[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance." Application Note 2, U.S.S.G. § 2D1.4. In this case, the Court based its estimation of the drug quantity involved in the conspiracy on Duncan's trial testimony. We have previously approved this practice. See, e.g., United States v. Duckworth, 945 F.2d 1052, 1054 (8th Cir.1991).[4] Our review of the trial transcript indicates that the District Court did not clearly err in attributing sixty-five pounds of methamphetamine to the defendants. The Court was entitled to believe Duncan's testimony on this point. We will not disturb its credibility determination. The calculation of the defendants' base offense level is affirmed.
 
 
 22
 All five of the defendants claim that it was error for the District Court to increase their offense levels by two points under U.S.S.G. § 2D1.1(b)(1) for possessing a dangerous weapon during the commission of a drug crime. They claim that their acquittal for carrying a weapon in connection with a drug-trafficking crime prevents a two-point enhancement for the same conduct. In United States v. Eberspacher, 936 F.2d 387, 389 (8th Cir.1991), we explicitly rejected this argument. As we explained in Eberspacher, in order to obtain a conviction under 18 U.S.C. § 924(c), the government must prove guilt beyond a reasonable doubt. Under the Guidelines, however, the government need only prove possession of a weapon by a preponderance of the evidence.[5]
 
 
 23
 Application Note 3 to U.S.S.G. § 2D1.1 states that the enhancement for possession of a weapon "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." Each defendant had a large cache of weapons in his home. Moreover, both Duncan and Deering testified that Curtis, Terrell, and England used firearms for protection of their drug business during the course of the conspiracy. At the time of his arrest, while on his way to pick up drugs, England had a weapon and ammunition in his car. During searches of Peacock's and Mosby's homes, police officers found weapons near drug paraphernalia. Given these facts, the District Court did not clearly err in finding that it was not "clearly improbable" that the defendants' weapons were connected to their drug trade. We affirm the District Court's assessment of the two-level enhancements under U.S.S.G. § 2D1.1(b)(1).
 
 
 24
 The defendants' final challenge to their sentences is that the District Court clearly erred by adding a three-level enhancement for their roles as managers or supervisors of a criminal enterprise involving five or more participants under U.S.S.G. § 3B1.1(b). The defendants do not dispute that the government proved by a preponderance of the evidence that their conspiracy involved five or more participants. Rather, they reject the characterization of their roles as supervisory or managerial.
 
 
 25
 It was not clearly erroneous for the District Court to infer that the defendants were managers or supervisors. After Duncan's source of methamphetamine dried up, England secured an alternative source for the network. Curtis served as the middleman for dealings between Duncan, on the one hand, and Mosby and Peacock, on the other. Morley purchased one pound of methamphetamine from Curtis for resale. Mosby provided drugs to Byrd for resale. If Byrd wanted to purchase a small amount of methamphetamine for personal use, Mosby would refer him to individuals selling drugs at the street level. When Duncan did not want to receive payments directly, Deering made his payments to Terrell. At Terrell's direction, three men drove methamphetamine from southeastern Missouri to Jonesboro, Arkansas. According to Curtis, he and Peacock were partners in their drug business. At the March 7, 1990, meeting, Peacock participated in negotiations with Duncan to buy two pounds of methamphetamine for himself, Curtis, and Mosby. In fact, he provided the $4,200 Duncan received from Curtis as the down payment on the two pounds. We affirm the District Court's imposition of the three-level enhancement.
 
 
 26
 We reject the defendants' other challenges to their sentences. Their sentences are affirmed.
 
 
 27
 * * * * * *
 
 
 28
 The judgments of the District Court are affirmed.
 
 
 29
 BRIGHT, Senior Circuit Judge, concurring separately.
 
 
 30
 I write separately to comment about the draconian sentences here imposed, and to observe that although not illegal, these sentences emanate from a scheme gone awry.
 
 
 31
 Sentences ought to balance punishment with societal needs as well as some concern for the offender. Under the sentencing guidelines scheme now in vogue, a judge can exercise little, if any, judgment on these matters. The probation officer computes the sentence; the judge generally only ratifies it.
 
 
 32
 In this case, both the offenders and society will suffer. Four defendants, England (age thirty-five), Terrell (age thirty-three), Curtis (age thirty-six) and Mosby (age forty) likely will spend the rest of their respective lives behind bars. Together, they will serve a total of 160 years in prison (with a very modest amount of time off for good behavior) and without parole eligibility. The cost to taxpayers will approximate $2,865,440 (160 years at $17,909 per year).[1] The suffering imposed on these men and their families cannot be calculated in monetary terms.
 
 
 33
 In my judgment, this sort of heavy punishment cannot be justified in a civilized society, unless there is a showing that lengthy incarcerations protect society from incorrigible and continuing criminals.
 
 
 34
 No such showing has been made in this case.
 
 
 35
 How did these sentences come to be? The Sentencing Commission in its finite wisdom sets the scales of punishment for drug crimes based on the weight of the drugs, not the criminality of the offender. This sentencing scheme is designed to further the war against drugs. Unfortunately, society does not seem to be winning that war by using these heavy punishments as weapons.
 
 
 36
 Indeed, the Commission's preoccupation with weights and measures as the basis for punishment in a case of this kind seems to run counter to the Congressional directive that the court shall impose a sentence that is sufficient, but "not greater than necessary to comply" with the sentencing objectives established by Congress. United States v. Quarles, 955 F.2d 498, 505 (8th Cir.1992) (Bright, J., concurring and dissenting) (quoting United States v. Davern, 937 F.2d 1041, 1046-47 (6th Cir.1991)).
 
 
 37
 In too many instances, the sentences directed by the guidelines waste the lives of men and women. This, however, is the current criminal sentencing system. It is time for re-evaluation and change. See, e.g., Gerald W. Heaney, The Reality of Guidelines Sentencing: No End to Disparity, 28 Am.Crim.L.Rev. 161 (1991).
 
 
 38
 While I am obligated to affirm the sentences, I need not and will not put my stamp of approval upon them. These sentences defy reason, but as I have already noted--such is our system.
 
 
 
 *
 The Hon. Richard S. Arnold became Chief Judge of the United States Court of Appeals for the Eighth Circuit on January 7, 1992
 
 
 [1]
 The Hon. Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri
 
 
 [2]
 Except for Peacock, the District Court assigned a base offense level of 38 to each defendant. It added two levels to the base offense level for possession of a firearm and three levels for the defendants' roles as managers or supervisors. With a total offense level of 43 and criminal history category of I, the guideline "range" was a life sentence. The District Court held, however, that the statutory maximum sentence under 21 U.S.C. § 841(b) was forty years. Consequently, the Court sentenced each defendant to forty years' imprisonment. While the government disputed this determination below, arguing that the applicable statutory maximum was life imprisonment, it has not appealed the District Court's ruling on this matter. We express no opinion on this ruling
 
 
 [3]
 In his reply brief, Mosby also argues that the District Court erred in attributing sixty-five pounds of methamphetamine to him because methamphetamine distributed by other defendants prior to his entering the conspiracy could not have been "reasonably foreseeable" to him. See Application Note 1, U.S.S.G. § 1B1.3. Since Mosby did not raise this argument in the District Court, we decline to address it
 
 
 [4]
 The government is required to prove drug quantities by a preponderance of the evidence. It is true that in United States v. Burks, 934 F.2d 148, 152 (8th Cir.1991), we indicated that "clear and convincing evidence" was needed to estimate drug quantities. This statement contradicts other Eighth Circuit cases explicitly holding that the applicable standard of proof is a preponderance of the evidence. See, e.g., United States v. Malbrough, 922 F.2d 458, 464 (8th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2907, 115 L.Ed.2d 1071 (1991) (rejecting clear and convincing standard). We therefore decline to follow Burks in this respect
 
 
 [5]
 The writer of this opinion, speaking only for himself, not for the Court, observes that the practice of sentencing someone for conduct of which the jury has acquitted him is unseemly and unworthy of the United States of America. Some United States Attorneys do not follow the practice. I applaud their discretion
 
 
 [1]
 See United States v. Quarles, 955 F.2d 498, 505 n. 6 (8th Cir.1992) (Bright, J., concurring and dissenting). The computation does not adjust for inflation