**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**Filed 8/20/96**

**TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

    No. 95-8076

ALAN BRUCE KLEIN,

    Defendant-Appellant.

_____

**Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 95-CR-10)**

_____

John R. Green, Assistant United States Attorney (David D. Freudenthal, United States Attorney, with him on the brief), Cheyenne, Wyoming, for Plaintiff-Appellee.

Daniel G. Blythe of Rogers, Blythe & Lewis, Cheyenne, Wyoming, for Defendant-Appellant.

_____

Before **BALDOCK, BRORBY** and **BARRETT**, Circuit Judges.

_____

**BRORBY**, Circuit Judge.

_____

Following a jury trial, Allen Bruce Klein was convicted of one count of

conspiracy to possess with intent to distribute and distribution of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846. The district court denied Mr. Klein's motion for a new trial and sentenced him to 240 months of imprisonment, eight years of supervised release, and fined him $10,000. Mr. Klein challenges his conviction and the $10,000 fine. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

Mr. Klein challenges his conviction on three grounds. First, he contends the incriminating statements he made to police following his arrest should have been suppressed because they were the fruits of an unlawful arrest. Second, Mr. Klein contends the trial court erred in permitting a witness named Dwight David Rogers to make an in-court identification of him. Third, he contends the trial court erred in submitting the indictment to the jury during their deliberations without redacting references to unproven overt acts. Finally, Mr. Klein challenges the $10,000 fine on the ground the trial court failed to consider his present or future ability to pay.

A. *Suppression of Incriminating Statements*

After his arrest and advisement of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), Mr. Klein admitted he was a supplier of large amounts of

methamphetamine, including over a pound of methamphetamine that was shipped to Wyoming.  Mr. Klein moved to have these incriminating statements suppressed, and the district court denied his motion.  Mr. Klein contends the statements should have been suppressed because he was arrested without probable cause.

The events leading to Mr. Klein's arrest began when Wyoming authorities arrested Dwight David Rogers for his role in shipping a package of methamphetamine from Phoenix, Arizona, to Reliance, Wyoming. After his arrest, Mr. Rogers made statements detailing the transaction and those involved.  He discussed the role of his supplier in Phoenix, a man whom he knew only as "Bruce."  Mr. Rogers described Bruce as being approximately five-ten to six feet tall with gray-brown hair and of Basque nationality.  He explained how he drove to Phoenix, contacted Bruce, and purchased over a pound of methamphetamine from Bruce at a home in Chandler, Arizona, a suburb of Phoenix.  Based on information provided by Mr. Rogers, the Wyoming authorities flew to Arizona to investigate and verify Mr. Rogers' story.  After arriving in Arizona, the officers contacted Mr. Rogers back in Wyoming and had him give them directions to the house where he had bought the methamphetamine from Bruce.  The directions led to 372 North Hartford, Chandler, Arizona, where the officers observed a blue

Pontiac Sunbird Mr. Rogers had described as the car used by Bruce. The listed owner of the house and the car was Richard West. Upon being shown a photograph of Richard West, Mr. Rogers said the person was definitely not Bruce. The Wyoming authorities surveilled the house in Chandler. At one point, the officers observed a man in the Sunbird who fit the description Mr. Rogers had given for Bruce. The officers followed the man to a department store and obtained a backside photograph of him as he entered the store. They sent this photograph, along with ones of the house and the Sunbird, to Wyoming for Mr. Rogers' identification. Mr. Rogers identified the car as the one he had seen Bruce in and identified the house as the one in which he had purchased methamphetamine from Bruce. Mr. Rogers thought the photograph of the man looked like Bruce, but could not be sure because of the distance from which it was taken. The Wyoming officers learned from Arizona authorities that they had information that a man named Bruce lived at 372 North Hartford in Chandler and was selling large quantities of methamphetamine. The Wyoming officers could not, however, locate or identify this Bruce.

In an effort to learn more about Bruce and the methamphetamine connection between Arizona and Wyoming, the Wyoming officers eventually obtained a search warrant for the house in Chandler from a federal magistrate in

Phoenix. The officers executed the warrant with help from Arizona officials. During the search, the officers encountered two women, Elizabeth Clark and Laura Beikler. Ms. Clark, who was in the house when officers began the search, confirmed that a man name Bruce lived at the house and was involved in trafficking methamphetamine. Ms. Beikler arrived at the house in the course of the search and was driving the blue Sunbird associated with Bruce. She confirmed that Bruce was a big trafficker of methamphetamine. She also explained that she had switched cars with Bruce and that he was en route to California in her car to pick up more methamphetamine. During the officers' interview of Ms. Beikler, a man called the house, identified himself as Bruce, and asked to speak with Ms. Beikler. Bruce told Ms. Beikler she had forgotten to leave her registration in her car and specified a convenience store at which she was to meet him with the registration. The officers got a description from Ms. Beikler of what Bruce looked like, what he was wearing, and what her car looked like. They relayed this information to a SWAT team, which left to look for the car and Bruce. At this point, the officers still did not know Bruce's last name. Upon arriving at the specified convenience store, the SWAT team identified Ms. Beikler's car. Though the car contained only a woman, officers observed a man in the store who matched the description given by Ms. Beikler. The officers arrested the man and took him to the house at 372 North Hartford, where the other officers

-5-

were still searching the residence. After being advised of his rights, the man identified himself as Bruce Klein and admitted to selling Mr. Rogers over a pound of methamphetamine.

A warrantless arrest for a felony normally is permissible as long as the arresting officer has probable cause. *United States v. Watson*, 423 U.S. 411, 414-23 (1976). The proper probable cause inquiry asks whether at the time of the arrest "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "'[P]robable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest.'" *United States v. Swingler*, 758 F.2d 477, 487 (10th Cir. 1985) (quoting *United States v. McManus*, 560 F.2d 747, 750 (6th Cir. 1977)).[1]

---

[1] We note that "in absence of an applicable federal statute the law of the state where an arrest without warrant takes place determines its validity even for federal crimes." *Swingler*, 758 F.2d at 487 (internal quotation marks and citation omitted). Assuming this rule applies in this case, the relevant substantive law would not change. Arizona permits warrantless arrests for felonies under the same standards as those established by the Supreme Court. *See* Ariz. Rev. Stat. Ann. § 13-3883; *Arizona v. Romero*, 870 P.2d 1141, 1146-47 (Ariz. Ct. App. 1994).

After a careful review of the record, we conclude probable cause supported Mr. Klein's arrest. From Mr. Rogers, the officers knew that a man named Bruce sold methamphetamine out of a home located at 372 North Hartford in Chandler, Arizona. They also knew he drove a blue Pontiac Sunbird. Upon executing a search warrant at 372 North Hartford, the officers were told by Ms. Clark that a man named Bruce lived at the house and trafficked in methamphetamine. Ms. Beikler corroborated Ms. Clark's appraisal of Bruce's methamphetamine trafficking and further informed the officers that Bruce could be found at a specified convenience store. She explained she was driving his blue Pontiac Sunbird because he was taking her car to California to pick up more methamphetamine. She gave them his description and told them what he was wearing. Upon arriving at the store, officers saw Mr. Klein and observed he matched the description of Bruce given by Ms. Beikler. Given these circumstances, we believe the officers had probable cause to believe Mr. Klein was the Bruce described to them by Mr. Rogers, Ms. Clark and Ms. Beikler as a methamphetamine trafficker. That the officers did not know Mr. Klein's actual identity until after they arrested him is of no moment. The arrest was lawful and the district court properly denied Mr. Klein's motion to suppress.

B. *In-Court Identification*

Mr. Klein contends the trial court erred by permitting Mr. Rogers to make an in-court identification of him. Mr. Klein argues the court should not have permitted Mr. Rogers to make the in-court identification on the grounds that a pre-trial photographic lineup was impermissibly suggestive and because the prosecution inadvertently identified Mr. Klein for Mr. Rogers during trial.[2] After a hearing in which it heard testimony concerning the pre-trial photographic lineup, the district court ruled that even though the pre-trial photographic identification was unnecessarily suggestive and should be suppressed, the in-court identification was nevertheless permissible. With respect to Mr. Klein's complaint with the prosecution's alleged identification of Mr. Klein for Mr. Rogers during trial, the district court found this was "a problem that [was] greatly diluted by the earlier suggestive [photographic] lineup."

---

[2] The government's alleged inadvertent identification of Mr. Klein for Mr. Rogers arose during trial. With the jury dismissed and Mr. Rogers on the stand, the attorneys and the court were discussing the admissibility of a hearsay statement. Mr. Rogers was in the process of testifying about a telephone conversation he had had with the as yet unidentified "Bruce" whom he eventually identified as Mr. Klein. The government offered the following argument:

> MR. GREEN: Judge, what I would submit is that we will connect up the voice to a person that's involved in this case, and that person ultimately will be the defendant, Bruce Klein, and that in the context of this statement, it's a statement made by a coconspirator.

As the Supreme Court has decreed, "[r]eliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977). Accordingly, we inquire whether Mr. Rogers' in-court identification of Mr. Klein was sufficiently reliable such that it did not create "a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).

First, and most importantly, Mr. Rogers met personally with Mr. Klein three times in two days. The first meeting, in which Mr. Rogers and Mr. Klein negotiated toward a methamphetamine transaction, lasted approximately twenty to thirty minutes. The second meeting, in which Mr. Rogers and Mr. Klein conducted the transaction, lasted approximately ten minutes. During the third meeting, which lasted thirty to forty-five minutes, Mr. Rogers negotiated with Mr. Klein for more methamphetamine. With respect to the first meeting, Mr. Rogers was able to offer a detailed description of the meeting, its circumstances, and location. With respect to Mr. Klein's physical appearance, Mr. Rogers described him as approximately six feet tall, 155 pounds, with grayish-brown hair, and of Basque origin. Though Mr. Rogers overestimated Mr. Klein's height, there is no indication his physical description was otherwise inaccurate. In our view, these facts indicate Mr. Rogers' in-court identification of Mr. Klein was sufficiently

reliable to overcome the risk of misidentification created by the suggestive photographic lineup and the government's alleged inadvertent identification of Mr. Klein to Mr. Rogers in court. The identification, therefore, did not violate Mr. Klein's due process rights.

C. *Submission of Unredacted Indictment to Jury*

Mr. Klein contends the district court erred by submitting the indictment to the jury without redacting references to overt acts not in evidence. The indictment, in part, read: "On or about December 7, 1994, KLEIN possessed with the intent to distribute approximately two ounces of methamphetamine, approximately $19,000.00 in cash, and a loaded Firestar .45 caliber semi-automatic handgun, serial number 2068522, in Chandler, Arizona." As the government concedes, it presented at trial no evidence as to the gun and evidence as to only part of the alleged $19,000. After the court received the jury's guilty verdict of conspiracy with respect to Mr. Klein and the jury had been dismissed, one of the jurors apparently informed Mr. Klein's counsel that she had not wanted to convict his client but that the .45 handgun and the $19,000 in cash mentioned in the indictment made the difference. After learning this, Mr. Klein's counsel returned to the courtroom and moved for a mistrial, explaining to the judge and the government what he had just learned. Concluding any error was harmless, the

-10-

district court denied the motion.

Mr. Klein then filed a motion for a new trial pursuant to Fed. R. Crim. P. 33. The district court held a hearing on the motion. Mr. Klein argued the unredacted references in the indictment were extraneous prejudicial information erroneously submitted to the jury. Mr. Klein then urged the court to examine the jurors pursuant to Fed. R. Evid. 606(b) to determine to what extent they considered this extrinsic evidence in reaching their verdict. The district court first found that the unredacted indictment was submitted to the jury. Concluding that Fed. R. Evid. 606(b) prohibited the court from making an inquiry into the actual effect the unredacted references might have had on the jury's deliberative process, the district court determined the submission of the unredacted indictment was harmless error. The court then denied the motion for a new trial. Mr. Klein contends the district court erred and that he is entitled to a new trial.

We begin our discussion of this issue with the juror's explanation to Mr. Klein's counsel that the references in the indictment to the handgun and the money helped her conclude Mr. Klein was guilty. We have no first-hand knowledge of this juror's reasoning. The juror's statements came into the record through the statements of Mr. Klein's attorney. Mr. Klein places great emphasis

on the juror's explanation of her guilty vote. According to Mr. Klein, since we know the indictment tainted the juror's deliberative process, we must grant him a new trial.

Unfortunately for Mr. Klein, we are prohibited from considering the actual effect the unredacted indictment may have had on the juror's thought processes. "While a juror 'may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention,' a juror 'may not testify as to ... the effect of anything ... concerning the juror's mental processes in connection therewith.'" *United States v. Davis*, 60 F.3d 1479, 1482 (10th Cir. 1995) (quoting Fed. R. Evid. 606(b)), *cert. denied*, 116 S. Ct. 1829 (1996). If the juror herself would be prohibited from explaining to the court the effect of the indictment on her decision to vote guilty, then clearly we may not consider the same just because it comes to us through the unsworn statement of Mr. Klein's attorney. It is not that we doubt the honesty of Mr. Klein's attorney, but that Rule 606(b) limits us to an objective evaluation of the effect the unredacted indictment had on the jury's verdict. *United States v. Hornung*, 848 F.2d 1040, 1045 (10th Cir. 1988), *cert. denied*, 489 U.S. 1069 (1989); *see Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 923-24 (10th Cir. 1992).

It rests within the district court's discretion to submit the indictment to the jury. *United States v. Skolek*, 474 F.2d 582, 586 (10th Cir. 1973). When the court, however, fails to redact references to prejudicial facts that are not in evidence, we believe the court may err by improperly placing before the jury extrinsic material the jury should not consider. Of course, the trial court's failure to redact surplusage from an indictment will not always amount to error. *See United States v. Crossland*, 642 F.2d 1113, 1115 (10th Cir. 1981) (not an abuse of discretion to submit indictment to jury without redacting testifying coconspirator's name). But when the unredacted information relates to prejudicial unproven facts such as that an alleged drug conspirator also possessed a handgun and large amounts of cash, we believe the risk of biasing the jury is great enough to require redaction. *See United States v. England*, 966 F.2d 403, 408 (8th Cir.), *cert. denied*, 506 U.S. 1025 (1992); *United States v. Williams*, 809 F.2d 75, 81 (1st Cir. 1986) (district court erred by failing to redact from indictment unproven claim that alleged drug conspirator possessed a sawed-off shotgun), *cert. denied*, 481 U.S. 1030 (1987). Mr. Klein contends failure to redact such potentially prejudicial information from an indictment is an error of constitutional dimension. Courts appear to go both ways on this issue. *Compare, e.g.*, *Williams*, 808 F.2d at 80 (failure to redact unproven overt acts from conspiracy indictment is error of constitutional dimension) *with England*, 966 F.2d at 408-09 (finding error where

trial court failed to redact from indictment unproven allegations but not applying harmless error standard required by *Chapman v. California*, 386 U.S. 18 (1967)). To support his contention the district court committed constitutional error, Mr. Klein argues this case is analogous to situations where a jury is exposed to information, like a newspaper article or communication by a third party, that is completely extraneous to the trial. *See, e.g., Mayhue*, 969 F.2d at 921-22 (jury consulted dictionary during its deliberations); *United States v. Thompson*, 908 F.2d 648, 649-50 (10th Cir. 1990) (some juror's may have read newspaper article containing prejudicial information excluded at trial); *Hornung*, 848 F.2d at 1043-44 (juror received information about the defendant from a third party).

Because it does not alter our conclusion that the district court's error was harmless, we assume, without deciding, that Mr. Klein is correct that the district court's failure to redact the challenged allegations from the indictment was an error of constitutional dimension. In such cases, the error is presumed to be prejudicial and the government is required to demonstrate the error was harmless. *Davis*, 60 F.3d at 1484-85; *Thompson*, 908 F.2d at 652-53; *see Chapman*, 386 U.S. at 24. As the Eighth Circuit has explained,

> [b]ecause Rule 606(b) precludes the district court from investigating the subjective effects of any extrinsic material on the jurors, whether such effects might be shown to affirm or negate the conclusion of actual prejudice, a presumption of prejudice is created and the burden

is on the government to prove harmlessness.

*United States v. Bassler*, 651 F.2d 600, 603 (8th Cir.), *cert. denied*, 454 U.S. 944 (1981); *see Remmer v. United States*, 347 U.S. 227, 229 (1954) (establishing presumption of prejudice when juror is contacted by third party about the case). "[A]s a general rule ... an error is harmless if the [government] can prove beyond a reasonable doubt that it did not contribute to the verdict." *Thompson*, 908 F.2d at 653 (citing *Chapman*, 386 U.S. at 24). Whether the error contributed to the verdict is, of course, evaluated objectively. *Hornung*, 848 F.2d at 1045.

After objectively "reviewing the entire record, analyzing the substance of the [unredacted information], and comparing it to that information of which the jurors were properly aware," *Hornung*, 848 F.2d at 1045 (internal quotation marks and citation omitted), we are convinced beyond a reasonable doubt that the failure to redact the challenged information was harmless error. We begin with the district court's repeated admonitions to the jury that the indictment was not evidence. During jury selection the district court explained:

> I'm about to read a portion of the indictment that has been filed in this case, and I want to caution you that it is not evidence of any wrongdoing. It is a charge. It is notice of the claims that are being asserted by the government .... So you must not consider it as evidence ....

The court gave a similar admonition during selection of alternate jurors, and right

before opening arguments again instructed the jury: "The indictment against the defendants brought by the Government is only an accusation, nothing more. It is not proof of guilt or anything else." Finally, at the close of trial the district court instructed the jury, "An Indictment is but a formal method of accusing a defendant of a crime. It is not evidence of any kind against the accused." The court read this instruction to the jury and submitted it to them in writing to consult during their deliberations. In our view, and that of other courts that have examined the problem, a proper covering instruction with respect to the indictment goes a long way toward curing any potential for prejudice created by giving the indictment to the jury. *See United States v. Utz*, 886 F.2d 1148, 1151 (9th Cir. 1989) (submission of unredacted indictment to jury would be harmless beyond a reasonable doubt if judge properly instructed jury that indictment is not evidence), *cert. denied*, 497 U.S. 1005 (1990); *Williams*, 809 F.2d at 80 n. 3; *United States v. Medina*, 761 F.2d 12, 21-22 (1st Cir. 1985); *see also England*, 966 F.2d at 408.

Next, we note the district court properly instructed the jury that to establish guilt under 21 U.S.C. § 846 the government need not prove any alleged member of the conspiracy performed any particular overt act in furtherance of the conspiracy. *United States v. Savaiano*, 843 F.2d 1280, 1294 (10th Cir.), *cert.*

*denied*, 488 U.S. 836 (1988). The unproven allegations that Mr. Klein possessed a handgun and large amounts of cash were alleged overt acts. That the government did not need to prove Mr. Klein engaged in any overt acts diminishes any potential for harm created by the jury learning of unproven overt acts. *See England*, 966 F.2d at 408.

Finally, we note that overwhelming evidence of Mr. Klein's guilt supported the jury's verdict. After he was arrested and advised of his rights, Mr. Klein agreed to talk with police officers. When told he was going to be charged with conspiracy to distribute two pounds of methamphetamine to Wyoming, Mr. Klein responded, "How could it be two pounds when all they got from me was a pound and a quarter?" Mr. Klein then bragged his distribution of two or three pounds of methamphetamine to Wyoming was "nothing" because he distributed forty pounds per week in the Phoenix area. The jury heard these incriminating statements by Mr. Klein through the testimony of one of the Drug Enforcement Agents who interviewed Mr. Klein. Also, as already noted, Mr. Rogers identified Mr. Klein to the jury as the man whom he met three times and from whom he purchased one and a quarter pounds of methamphetamine. In our view, Mr. Klein's confession to police officers, as corroborated by Mr. Rogers, provided overwhelming evidence of his guilt. As is well-recognized, "the most common means of demonstrating

-17-

the harmlessness of an extraneous contact is to show the existence of 'overwhelming evidence of [the] defendant's guilt.'" *Davis*, 60 F.3d at 1485 (quoting *Hornung*, 848 F.2d at 1045); *see Williams*, 809 F.2d at 81-82 (applying overwhelming evidence test when court submitted indictment to jury without redacting references to unproven overt acts); *United States v. Parker*, 586 F.2d 1253, 1258 (8th Cir. 1978) (same); *United States v. Marx*, 485 F.2d 1179, 1184 (10th Cir. 1973) (jury's viewing of unadmitted exhibits was harmless because there was overwhelming evidence of defendant's guilt), *cert. denied*, 416 U.S. 986 (1974).

We believe the reasons given above provide us more than enough justification to conclude the government met its burden of proving the district court committed harmless error when it submitted the unredacted indictment to the jury.

D. *The $10,000 Fine*

Mr. Klein disputes the district court's decision to include a $10,000 fine as part of his sentence. We review the imposition of a fine under the sentencing guidelines for an abuse of discretion. *United States v. Meuli*, 8 F.3d 1481, 1487 (10th Cir. 1993), *cert. denied*, 114 S. Ct. 1403 (1994). The sentencing guidelines

require the court to "impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. §5E1.2(a). With a total offense level of 34, the fine range for Mr. Klein's conviction was $17,500 to $8,000,000 pursuant to U.S.S.G. §5E1.2(c)(3) & (4) and 21 U.S.C. § 841(b)(1)(A). After reviewing the evidence before him, the district court exercised its discretion in imposing a fine significantly lower than the guideline minimum. U.S.S.G. §5E1.2, comment. (n. 3).

Mr. Klein contends the district court erred by failing to consider his present or future ability to pay. After carefully reviewing the record we find this contention to be without merit. Mr. Klein bore the burden of proving his inability to pay a fine. *United States v. Ballard*, 16 F.3d 1110, 1114 (10th Cir.), *cert. denied*, 114 S. Ct. 2762 (1994). During preparation of his presentence report and at the sentencing hearing, Mr. Klein failed to produce any evidence of his inability to pay a fine. Instead he asked the court to delay its decision so it could review an affidavit showing his indigence, which affidavit he was preparing to support his request for the appointment of an attorney under the Criminal Justice Act. Mr. Klein stated this affidavit would support his claim that he is without assets. The district court declined to wait for the submission of this affidavit and

found:

> I would note there is an employment record showing that the defendant has been employed as a service manager of an auto repair business earning 200 to $250 per week, has been self-employed buying and selling Harley Davidson motorcycles, has worked in the photography business for Mr. Logan, a movie set design and odd jobs, and has also owned a construction company in the early 1980s in Florida.
>
> At this point the Court is able to find from the presentence report that the defendant has an earning capacity, that is, ability to maintain employment, to be involved in gainful employment, earning upwards to 250 per week.
>
> There is no evidence of financial resources that has been demonstrated. There is no evidence of financial dependency upon the defendant that would indicate that he is responsible for the welfare of other persons who are financially dependent upon him. Any fine ordered by this Court would result in a pecuniary loss inflicted upon the defendant rather than others. Certainly there is a policy to deprive the defendant of illegally obtained gains from the offense and here there is no restitution issue for the Court to be concerned with.
>
> There are no assets from which a fine may be collected that the Court has any awareness. So a fine appears to be payable from the earnings of the defendant, if any, that he may accumulate from time to time.

In its findings, the district court clearly accepts Mr. Klein's claims that he possesses no assets and instead relies on his earning potential in assessing the fine. After the sentencing hearing, Mr. Klein submitted a motion to relieve his obligation to pay the fine and attached the above referenced affidavit. The district court denied this motion and again acknowledged Mr. Klein's lack of

-20-

assets, employment history and earning capacity.

Mr. Klein's indigence at the time of sentencing did not preclude imposition of a fine. *United States v. Sneed*, 34 F.3d 1570, 1586 (10th Cir. 1994) (finding no plain error where court based fine on defendant's earning capacity); *United States v. Favorito*, 5 F.3d 1338, 1339 (9th Cir. 1993), *cert.denied*, 114 S. Ct. 1374 (1994); *United States v. Hagmann*, 950 F.2d 175, 185-86 (5th Cir. 1991), *cert. denied*, 506 U.S. 835 (1992); *United States v. Mastropierro*, 931 F.2d 905, 907 (D.C. Cir. 1991). Mr. Klein has failed to submit any evidence establishing his inability to find future employment or any evidence indicating current or future financial liabilities which would prevent him from using his future earnings to pay the fine. He simply rests on his current lack of assets. This reliance on his current insolvency is not enough to meet his burden of proving his inability to pay the fine sometime in the future. In light of the evidence submitted to the district court and the small size of the fine compared to the range permitted by the sentencing guidelines, we find the district court did not abuse its discretion in imposing a $10,000 fine against Mr. Klein.

For the reasons given above, the decisions of the district court challenged by Mr. Klein are **AFFIRMED**.