**UNITED STATES of America, Plaintiff,**

**v.**

**James KELLEY, and Gerald Austin McCormick, Defendants.**

Nos. 97–40024–01, 97–40024–02.

United States District Court, D. Kansas.

Feb. 24, 1998.

Stephen J. Atherton, Emporia, Joseph D. Johnson, Joseph D. Johnson, Chartered, Topeka, KS, for James O. Kelley.

James O. Kelley, Lawrence, KS, pro se.

Steven L. Davis, Patton, Davis & Putnam, P.A., Emporia, KS, William K. Rork, Rork Law Office, Topeka, KS, for Gerald Austin McCormick.

Gerald Austin McCormick, Lawrence, KS, pro se.

Gregory G. Hough, Office of United States Attorney, Topeka, KS, for U.S.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

The case comes before the court on the defendant McCormick's second set of pretrial motions and the government's motion in limine. The defendant McCormick filed his first set of pretrial motions in July of 1997. (Dks.25, 26, 40–47). The court denied those motions in its order filed September 2, 1997. (Dk.54). Of those motions denied, one sought leave to file additional motions. (Dk.40). In denying that motion, the court said it would reconsider its ruling and possi-

bly extend the time to file new or supplemental pretrial motions upon good cause shown, (Dk.54, p. 5).

On September 10, 1997, the defendant McCormick filed a "Notice of Intent to File Motion for Reconsideration and Memorandums in Support Thereof." (Dk.55). On September 29, 1997, McCormick filed the following motions:

**Motion for Continuance (Dk.56).**

**Motion to Suppress Items Seized from McCormick/Sloan Residence (Dk.57).**

**Motion to Dismiss Charges and/or to Suppress Evidence Found in Motor Vehicle or Residence (Dk.59).**

The government has filed a consolidated re-·sponse to this second set of pretrial motions. (Dk.61). By written order filed October 2, 1997, the court granted McCormick's motion for continuance and rescheduled the jury trial for December 9, 1997. (Dk.62). The court set McCormick's remaining motions for hearing on November 7, 1997, rescheduled the hearing for December 15, 1997, and then continued the hearing until February 6, 1998. During this time the government filed a motion in limine (Dk.65) seeking to keep the defendants from having Ed Rosenthal testify as an expert witness concerning the cultivation, harvesting and use of marijuana. The government subsequently filed a motion to have its limine motion decided upon the briefs. (Dk.75). Upon the agreement of all counsel on February 6, 1998, the court heard and had submitted to it all evidence relevant to these pending motions. The court gave counsel until February 23, 1998, to submit any supplemental briefs. The jury trial is scheduled to start March 3, 1998.

**INDICTMENT**

On April 1, 1997, the grand jury returned a two-count indictment against the defendants James Kelley and Gerald Austin McCormick. The first count charges the defendants with conspiring from June 1, 1996, to on or about August 29, 1996, to possess with the intent to distribute "approximately 106 marijuana plants" in violation of 21 U.S.C. § 846. The second count charges the defendants with possessing with the intent to distribute "approximately 106 marijuana plants" in violation of 21 U.S.C. § 841(a)(1).

**PROCEDURAL ISSUES**

In the defendant McCormick's supplemental brief, entitled "Closing Comments Reference Dismissal and/or Suppression Issues," defense counsel "reaffirm[s]" a rambling objection to one of the court's procedural rulings at the evidentiary hearing. Citing no legal authorities for his position, the defendant objects that he was required to proceed first with the production of testimony. The defendant makes the frivolous argument that this procedure prejudiced him and gave the government an unfair advantage, "in light of the fact the government was able to gain strategic advantages over what challenges this accused was making, the government very well may not have touched upon and gone into various issues of fact or examination of witnesses on testimony, but for, the accused having to present testimony and evidence first." (Dk.86, p. 2).

■ The record should reflect that the court directed defense counsel to proceed forward with his motion. Without articulating or proffering for the court his client's standing or a prima facie Fourth Amendment violation,[1] the defense counsel simply objected and requested the government to meet its burden of proof. The court informed counsel that he understood where the burden of proof rested on the different issues. At that point, the defense counsel then called the Special Agent Bruce Coffman and examined him using leading questions. This is the only witness, other than the defendant's own witnesses, Ms. Sloan and Mr. McCormick, who was called and examined first by the defendant. After Coffman, the government called and examined Special Agent Hutchings, who was then cross-examined by the defendants. Any prejudice and unfair advantage that the defense counsel can possibly fathom from these innocuous circumstances is due exclusively to their own misunderstanding of the parties' respective burdens of proof and to

---

1. The defendant has the burden of proving standing and a prima facie Fourth Amendment violation. *United States v. Carhee,* 27 F.3d 1493, 1496 (10th Cir.1994) (The defendant "bears the burden of proving whether and when the Fourth Amendment was implicated."); *United States v. Singleton,* 922 F.Supp. 1522, 1527 (D.Kan.1996).

their own strategy in offering certain testimony.[2] The defendant's objection is devoid of merit.

## FACTS

The following facts are based on the testimony presented at the hearing and gleaned from the affidavits submitted in support of the search warrants. On August 19, 1996, Special Agent Christy was flying at an altitude of 1000' in Lyon County, Kansas, when he observed certain green vegetation that he believed to be marijuana. The suspected marijuana was surrounded by trees, brush and weeds which kept it from being viewed from the road. The small field was between a creek and a gravel road that ran east and west. The color of the marijuana differed from the native vegetation growing around it and resembled the color of marijuana seized on prior occasions. Agent Christy photographed the area from the aircraft. The aerial photographs were admitted at the evidentiary hearing.

On August 21, 1996, Special Agents Doug Jorgensen, Cathy Elser and Jim Young walked into the area that Christy had spotted and photographed from his aircraft. These agents observed marijuana plants of varying heights growing in a cleared area. Agents also observed in the mud along the pathway leading to the marijuana an impression made by a Converse gym shoe. This was an isolated area. The nearest farm house was over one-half mile away and was occupied by a 92–year–old man who also owned the land upon which the marijuana was growing. The elderly man was Special Agent Bruce Coffman's great uncle.

During the morning hours of August 29, 1996, law enforcement officers were watching the country road near this field of marijuana. The officers present that morning were Bruce Coffman and Jim Young, special agents with Kansas Bureau of Investigation, David Smith, an officer with Garden City Drug Enforcement Administration Task Force, and Gary Eichorn, an officer with the Lyon County Sheriff's office. Coffman and Smith hid themselves in the brush approximately thirty feet from the road. The other two officers were back another thirty feet also hidden in the brush and trees. Around 8:00 a.m., officers observed a pickup headed east driven by someone who was believed to be a local farmer. The pickup returned from the east approximately twenty minutes later. This pickup did not stop near the field and only slowed to turn the corner. For the next ninety minutes, no other vehicle drove along this gravel road.

Around 9:56 a.m., Agent Coffman heard a vehicle approach from the north and slow down. Coffman next heard the vehicle coming to a stop, a door slam, and the vehicle picking up speed again. When the vehicle came within his field of vision, Coffman saw a blue jeep-type vehicle with rusted wheel wells and no top driven by a white male, short brown hair, and a large upper body. The vehicle was moving away from the field headed west and then turning south. Coffman heard someone or something running through the woods that were between the road and the field.

Special Agent Jim Young and Lyon County Sheriff Officer Gary Eichorn saw a white

---

**2.** The defendant argues as an example of prejudice the following:

> For instance, allowing the government to inquire of McCormick whether he knew the motor vehicle for which he was arrested in, prior to that arrest, was owned by the co-defendant, was over objection to counsel for McCormick, ordered to be answered. The issue concerning the facts surrounding the arrest of McCormick is what was in the knowledge of law enforcement at the time of the arrest, and law enforcement did not even know whose vehicle it was until after the arrest of both accused. This is but just one example of a circumstance which potentially may be prejudicial to this accused by having him proceed with the introduction of testimony, first.

(Dk.86, p. 2). This argument is ridiculous for several reasons. If followed to its logical conclusion, the argument makes most of McCormick's testimony irrelevant, because the officers could not have known McCormick's actual thoughts just before and during his arrest. It was the defendant's decision to call himself as the last witness in the evidentiary hearing. It was the defendant's decision to testify about why he slowed the vehicle and why he was racing the engine before the corner. This testimony plainly exposed McCormick to proper cross-examination concerning a number of issues, including his own familiarity and experience with the motor vehicle that he was driving on the morning of his arrest.

male run into the trees wearing a backpack. The subject ran towards the entry path to the field, laid down the backpack, and moved southwest under the trees. The subject then returned to the backpack and removed a hand sprayer. With the sprayer, the subject walked down the pathway leading to the marijuana. The officers heard the subject pumping the hand sprayer three or four times. The subject then ran out of weeds and up the pathway where officers arrested him. The subject was identified as James Kelley living at 2006 Rhode Island, Lawrence, Kansas. Officers found on Kelley a backpack which contained insect repellant, fertilizer, garden fungicide, and a machete. Kelley asked if he was in trouble, and the officers told him, "Yes." Kelley, however, refused to tell officers who the driver was and when he was returning. One officer kept Kelley in the woods while the other three returned to the area near the road.

Around 10:23 a.m., Agent Coffman was taking photographs of footprints when he heard a vehicle approaching from the south and west. He observed that the vehicle was the same blue jeep-type vehicle that apparently had dropped off Kelley earlier. The driver slowed down, pulled off to the far right shoulder of the road, and stopped near one of the two trails leading through the trees and brush to the marijuana plants. Coffman saw the brake lights glowing on the vehicle. The driver looked into the trees and brush and then raced the engine three or more times. Two officers at that time shouted at the driver to exit the vehicle and then pulled him out of a vehicle and placed him under arrest. The driver had long hair and was wearing a light-brown ball cap, a flesh-colored T-shirt, and a pair of Converse gym shoes. The driver was identified as the defendant Gerald Austin McCormick.

Special Agent Coffman did not believe at the time of arrest and does not believe now that McCormick was driving the rusted blue Toyota Landcruiser when Kelley was dropped off. In fact, after arresting McCormick, two officers walked some distance along the road in an effort to locate the third person.

Officers seized approximately 106 marijuana plants weighing 450 pounds from the field. The Landcruiser was towed to the Lyon County Sheriff's vehicle holding area following the arrests. On August 30, 1996, a search warrant was issued by Lyon County District Court for the search of the Land-cruiser that was being held. Officers found clothing, water jug, garden hose, and sleeping bags in the vehicle.

Around 8:05 p.m. on August 29, 1996, Special Agents James Woods, Kevin Campbell, Anthony Weingartner, and David Hutchings went to 2000 Barker Court, Lawrence, Kansas. The agents were greeted by Kathryn Sloan who was carrying her three-week-old baby and was accompanied by her five-year-old son. They identified themselves and asked if Gerald McCormick lived there. Ms. Sloan said that McCormick did live there and that he was her husband. Agent Hutchings advised that her husband had been arrested for cultivation of marijuana. Ms. Sloan asked where her husband was located. The officers told her that McCormick was being held at Lyon County jail. Agent Woods asked if Sloan's home was the place of business of Yuma Hemp Traders. Ms. Sloan explained that the business had changed its name to Free State International. She recalls that Agent Woods and Agent Hutchings took turns asking her questions. The agents asked to see her identification and sought permission to ask additional questions about McCormick, herself, her work, and their business. Sloan told them, "Sure, yes" and she allowed the officers to enter her home.

Sloan showed the officers her identification which was laying on the piano. Agent Hutchings then asked if there was any marijuana or marijuana paraphernalia in the house, and Sloan said, "No." Agent Woods continued to ask Sloan questions about their business formerly known as Yuma Hemp Traders. In an effort to prove that the business now operated as Free State International was a legitimate clothing import business, Sloan showed Agent Woods a suitcase that contained their sample shipment of clothing brought back from China. The suitcase was located at one end of the extended living room. Sloan then placed her baby down and opened the suitcase. While she showed Agent Woods the clothing, Sloan did not see the other three agents who had been

standing at the other end of the living room walk into the adjacent master bedroom.

After about ten minutes, Sloan walked towards the kitchen to get a bottle of formula for the baby when Agent Hutchings emerged from the bedroom carrying something. Sloan asked what Hutchings was carrying and he showed her a small zip-loc bag containing some seeds. Sloan then asked, "What's going on here?" "Don't I have any rights?" "What are my rights here?" Agent Woods then explained that she could request a search warrant, and Sloan then made that request. Up to that point in time, Sloan did not understand any of the officers' multiple questions to be a request to search the residence. Sloan did not knowingly consent to any search of the residence.

Agent Hutchings testified that Sloan had consented to their search of the residence and that during his search of the master bedroom he opened the top drawer of a dresser and found the small plastic bag containing seeds. Hutchings said that Agent Woods then came back to the bedroom and informed him that Sloan had revoked her consent to search. Hutchings testified that he then asked Sloan why she had revoked her consent and she said that "when she had given her consent, she didn't think we would find anything, and that when we did, she felt like she had made a mistake in giving us consent." (Dk.82, p. 8).

The agents stopped their search and went for a search warrant but they left one agent to secure the scene. That evening at approximately 11:10 p.m., the Douglas County District Court issued a search warrant for McCormick's residence at 2000 Barker Court in Lawrence, Kansas. Besides the marijuana seeds found earlier, officers found five baggies of marijuana seeds in a maroon backpack, a baggie of marijuana, a triple beam scale, a bag of plastic wrap, and a bag of starter fertilizer.

## MOTION TO JOIN CO–DEFENDANT' MOTIONS (Dk.27)

In its order filed September 2, 1997, the court granted the defendant Kelley's motion to join McCormick's motions subject to the limitations imposed by this court's *Criminal Procedural Guidelines.* The court acknowledges that its ruling applies with equal force to the defendant McCormick's current motions to suppress.[3]

## MOTION TO DISMISS CHARGES OR SUPPRESS EVIDENCE FOUND IN THE SEARCH OF HIS MOTOR VEHICLE, HIS PERSON, AND HIS RESIDENCE (Dk.59).

McCormick argues officers lacked probable cause to arrest him on the morning of August 29, 1996. McCormick stipulated at the hearing that if officers had probable cause to arrest him then their search of him and the vehicle was a proper search incidental to arrest. McCormick testified he was driving along this country road that he slowed to turn the corner but had not stopped the vehicle. Because the motor was wet, he raced it several times to prevent it from stalling while he slowly turned the corner. McCormick testified to his surprise when officers emerged from cover with guns drawn and then arrested him. McCormick also testified about the officers looking for another person after his arrest.

*Probable Cause for Arrest*

"A warrantless arrest for a felony normally is permissible as long as the arresting officer has probable cause." *United States v. Klein,* 93 F.3d 698, 701 (10th Cir.) (citing *United States v. Watson,* 423 U.S. 411, 414–23, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)), *cert. denied,* —— U.S. ——, 117 S.Ct. 624, 136 L.Ed.2d 547 (1996). Officers have probable cause to arrest if they know facts "that would 'warrant a [person] of reasonable caution in the belief that an offense has been or is being committed.'" *United States v. Bruce,* 78 F.3d 1506, 1508 (10th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 149, 136 L.Ed.2d 95 (1996). " '[P]robable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest.'" *United States v. Klein,* 93 F.3d at 701 (quoting *United States v. Swingler,* 758 F.2d 477, 487 (10th Cir.1985) (quoting in turn *United States v. McManus,*

---

**3.** Kelley appears to have standing only to challenge the search of the Toyota Landcruiser, which was registered in his name.

560 F.2d 747, 750 (6th Cir.1977), *cert. denied,* 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 798 (1978))). " 'Probable cause must be evaluated in light of circumstances as they would have appeared to a prudent, cautious, trained police officer.' " *United States v. Snow,* 82 F.3d 935, 942 (10th Cir.1996) (quoting *United States v. Morgan,* 936 F.2d 1561, 1568 (10th Cir.1991), *cert. denied,* 502 U.S. 1102, 112 S.Ct. 1190, 117 L.Ed.2d 431 (1992)). When probable cause for a warrantless arrest is challenged, the court inquires "whether at the time of the arrest 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *United States v. Klein,* 93 F.3d at 701 (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)).

█ Based on the following facts, the court finds that the officers had probable cause to believe that McCormick was involved with Kelley in the cultivation of the marijuana. When the blue Jeep-type vehicle first drove by the field, officers heard it slow down and a door slam. Officers observed the vehicle speed up and drive away to the west and then turn south. Minutes or seconds later, officers heard someone running towards the marijuana field. Officers observed the person later identified as Kelley carrying a backpack as he ran towards the field. When he reached the field, Kelley tended the marijuana plants by taking a sprayer from his backpack and using it on some of the plants.

Less than one-half hour after it went by the first time and dropped off Kelley, the very same blue Jeep-type vehicle returned coming from the south and west. The driver stopped the vehicle near one of two trails leading to the marijuana field. The driver looked into the wooded area and raced the engine three times as an apparent signal to Kelley. At that point, officers had probable cause to believe that the driver, who was later identified as McCormick, was assisting Kelley in the cultivation of the marijuana.

The court does not consider the discrepancy in the officers' descriptions of the driver or drivers to have a material effect on its finding of probable cause. The officers be-lieved at the time and still believe today that McCormick was not driving the vehicle when Kelley was dropped off. The critical facts here are that the same vehicle dropped off Kelley and returned for him a short time later. The vehicle returned from the direction that it had left. It stopped near a trail on land that was owned by a 92-year-old man. The apparent plan was that Kelley would be at the field for only a short time. After he was dropped off Kelley ran through the timber towards the marijuana field and worked quickly in tending the plants. The driver who dropped off Kelley did not park the car, exit the car, and shut off the engine. McCormick's actions were the same when he arrived and pulled off onto the shoulder of the road. Instead of using the horn to signal his arrival, McCormick used the more discrete signal of racing the engine. There is no plausible innocent explanation for McCormick stopping his vehicle in this isolated, wooded area and racing his engine while peering into the woods. Though McCormick was not the driver who dropped off Kelley, his furtive actions in pulling onto the shoulder near a trail leading to the field, looking into the woods, and racing the engine three times as an apparent signal are enough for the officers to conclude there was probable cause to arrest him.

█ As part of a valid custodial arrest, the police may search the arrestee without a warrant and without probable cause or reasonable suspicion that the arrestee possesses either weapons or evidence. *New York v. Belton,* 453 U.S. 454, 461, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). Upon the lawful arrest of McCormick, the officers could search him as part of a valid custodial arrest, and they could search the passenger compartment of the Toyota Landcruiser, *United States v. Ortiz,* 63 F.3d 952, 954 (10th Cir.1995). Since this same vehicle had been used to transport Kelley to the marijuana field, since Kelley had used a sprayer that he brought with him to tend the marijuana, since gardening equipment is used in the cultivation of marijuana fields, and since officers had not found gardening equipment around the marijuana field, the officers also had probable cause to believe that the vehicle would contain evidence that Kelley and McCormick had been

cultivating marijuana. Moreover, McCormick stipulates that the officers could properly search him and the vehicle upon his lawful arrest. For all of these reasons, the court denies McCormick's motion to dismiss and/or suppress the evidence (Dk.59) seized from his person and the vehicle during the search incidental to his arrest.

## MOTION TO SUPPRESS ITEMS SEIZED FROM MCCORMICK'S RESIDENCE (Dk.57).

The defendant argues that Sloan consented to the officers coming in the residence for the purpose of asking additional questions but that Sloan never authorized any search of the residence. McCormick argues that as a result of this non-consensual, warrantless search of their residence any evidence seized during this search cannot be used to support the subsequent issuance of a search warrant. McCormick also contends that the warrant is not supported by probable cause and that the affidavit contains false statements and omits material facts.

*Consensual Search*

■ A warrantless search of a suspect's residence is per se unreasonable under the Fourth Amendment unless the government can show the search qualifies under a recognized exception, such as a consensual search. *United States v. Butler,* 966 F.2d 559, 562 (10th Cir.1992). The government has the burden of proving valid consent to a warrantless search. *United States v. Cody,* 7 F.3d 1523, 1526 (10th Cir.1993). In this circuit, there is a two-step test involved in determining whether the government has proved the defendant voluntarily consented to the search: "the government must (1) 'proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given' and (2) 'prove' that this consent was given without implied or express duress or coercion.'" *United States v. Sanchez,* 89 F.3d 715, 719 (10th Cir.1996) (quoting *United States v. McRae,* 81 F.3d 1528, 1537 (10th Cir.1996)). This determination entails consideration of such factors as: physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the party said to have consented. *United*

*States v. McCurdy,* 40 F.3d 1111, 1119 (10th Cir.1994). Another "important" factor is whether the officers told the person that she could refuse consent. *United States v. Orrego–Fernandez,* 78 F.3d 1497, 1505 (10th Cir. 1996). When making this determination, the court should not presume that the consent was either voluntary or involuntary. *United States v. Soto,* 988 F.2d 1548, 1557 (10th Cir.1993).

■ The court concludes that the government has not sustained its burden in proving that Sloan voluntarily consented to the search of her residence. The court finds Sloan's testimony of what happened on the evening of August 29, 1996, to be credible. Her account of several officers making repeated inquiries on several different topics, including the lawfulness of her business formerly named Yuma Hemp Traders, seems quite plausible. Considering the circumstances that faced Sloan that evening—caring for a three-week-old baby, trying to calm a five-year-old son alarmed over hearing that his daddy was in jail, and having four KBI agents inside her house asking questions that indicated their suspicion of her—the court believes it quite likely that Sloan never understood she was specifically giving consent to a search of her residence. The physical layout of the Sloan's house is consistent with her explanation for not seeing the three officers begin their search of her residence. On the witness stand, Sloan showed herself to be an articulate, well-educated, and intelligent person. Her testimony on how she reacted upon learning that the officers had started searching her house is more plausible than that proffered by the government. For all of these reasons, the court finds that the government has failed to prove a lawful, consensual search of McCormick/Sloan residence on August 29, 1996. Thus, the evidence found during this initial warrantless search was unconstitutionally obtained.

*Search Warrants*

■ The package of marijuana seeds found during the unconstitutional warrantless search of the McCormick/Sloan residence was used to support the search warrant that was ultimately obtained for the

residence. "Evidence seized during an illegal search should not be included in a warrant affidavit." *United States v. Trzaska,* 111 F.3d 1019, 1026 (2d Cir.1997) (citations omitted); *see United States v. Cusumano,* 83 F.3d 1247, 1250 (10th Cir.1996). However, " '[t]he mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant.' " *United States v. Trzaska,* 111 F.3d at 1026 (quoting *United States v. Reilly,* 76 F.3d 1271, 1282 n. 2 (2d Cir.1996) (quoting in turn *United States v. Vasey,* 834 F.2d 782, 788 (9th Cir.1987))). The reviewing court may excise the tainted matters from the affidavit and determine whether sufficient untainted facts remain for a magistrate to find probable cause and issue a warrant. *United States v. Karo,* 468 U.S. 705, 719, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984); *United States v. Cusumano,* 83 F.3d at 1250.

Generally, a search must be made pursuant to a warrant based on probable cause. U.S. Const. amend. IV. The reviewing court gives "great deference" to the issuing judge's determination of probable cause, for it is a determination based on common sense. *United States v. Finnigin,* 113 F.3d 1182, 1185 (10th Cir.1997). The issuing judge must make a practical, common-sense determination from the totality of the circumstances presented whether there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The issuing judge is expected to draw reasonable inferences from the affidavits. *See United States v. Edmonson,* 962 F.2d 1535, 1540 (10th Cir. 1992). The reviewing court will uphold that determination if the supporting affidavits provide a substantial basis for finding that probable cause existed. *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *United States v. Finnigin,* 113 F.3d at 1185. "In applying the test enunciated in *Gates,* this Court has stated that the 'affidavit' should be considered in a common sense, nontechnical manner ..." *Edmonson,* 962 F.2d at 1540 (quoting *United States v. Massey,* 687 F.2d 1348, 1355 (10th Cir.1982) (citation omitted)).

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates,* 462 U.S. at 232, 103 S.Ct. 2317. The Supreme Court has found it sufficient to say that probable cause is more than a mere suspicion, but considerably less than what is necessary to convict someone. *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *see United States v. Wicks,* 995 F.2d 964, 972 (10th Cir.) ("The existence of probable cause is a 'common-sense standard' requiring 'facts sufficient "to warrant a man of reasonable caution in belief that an offense has been committed.' " ") (quoting *United States v. Mesa–Rincon,* 911 F.2d 1433, 1439 (10th Cir.1990) (quoting *Brinegar v. United States,* 338 U.S. 160, 174, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)), *cert. denied,* 510 U.S. 982, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993)).

Probable cause to search a location does not depend on direct evidence or personal knowledge that evidence or contraband is located there. *United States v. Hargus,* 128 F.3d 1358, 1362 (10th Cir.1997), *petition for cert. filed,* 66 U.S.L.W. 3687, —— U.S. ——, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998). The affidavit need not aver that criminal activity actually occurred there. *See United States v. $149,442.43 in U.S. Currency,* 965 F.2d 868, 874 (10th Cir.1992). It is enough when the affidavit establishes a "nexus between the objects to be seized and the place to be searched" from which "a person of reasonable caution" would "believe that the articles sought would be found" there. *United States v. Hargus,* 128 F.3d at 1362. This nexus "may be established through ... normal inferences as to where the articles sought would be located." *United States v. Freeman,* 685 F.2d 942, 949 (5th Cir.1982). "[C]ourts often rely on the opinion of police officers as to where contraband may be kept." *United States v. $149,442.43 in U.S. Currency,* 965 F.2d at 874 (citations omitted). "Where a suspect has no place of business separate from this residence, it is reasonable for an officer to conclude that evidence may be at the suspect's residence." *Id.* (citation omitted); *see United States v. Pace,* 955 F.2d 270, 277 (5th Cir.1992) ("The

expectation of finding evidence of the crime [growing marijuana] at the suspect's home, *given that such evidence was not found at the scene of the illegal activity,* was a reasonable inference which supported the magistrate's determination of probable cause to search the residence."). In *Pace,* the Fifth Circuit observed:

> While the notion that "few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime," *United States v. Green,* 634 F.2d 222, 226 (5th Cir.1981), does not provide carte blanche for searching a home when one is suspected of illegal activity, concealment of the business records of a drug operation at home certainly is a reasonable inference when a search of the situs of the operation yields no records.

955 F.2d at 277–78.

The court believes the affidavit, deleting all references to the marijuana seeds found during the unconstitutional search, still provides a substantial basis for probable cause to believe that the evidence and contraband sought would be found at McCormick's residence. The affidavit shows that McCormick was involved with James Kelley in cultivating marijuana on land that was "away from any residences" and that was owned by another person who was not involved in this criminal endeavor. Kelley was arrested upon entering the field of marijuana and using a garden sprayer. Kelly was carrying a backpack that contained "insect repellant, fertilizer, garden fugicide (sic), and a machete." From these facts, the issuing judge could reasonably infer that the defendants were involved in cultivating marijuana in an isolated area away from any residences and that the defendants stored their cultivating equipment elsewhere and brought only what they needed with them. There being no facts to indicate that the defendants were storing the cultivating equipment, harvested marijuana, and processing and packaging items in a location that was more convenient than their residences, the issuing judge could reasonably conclude that such matters would be found at the defendant's residence.

McCormick also attacks the affidavit as omitting Sloan's version of what occurred at her home earlier that evening and the officers' conflicting descriptions of the driver who dropped off Kelley and McCormick who was later arrested as the driver. The defendant has not demonstrated a deliberate falsity or reckless disregard for the truth by the affiant. *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Moreover, the omission of Sloan's version and the arresting officers' descriptions of two different drivers does not vitiate probable cause. The affidavit adequately avers McCormick's connection to the criminal activity. The same vehicle that had dropped off Kelley was driven back to the marijuana field twenty-four minutes later to pick up Kelley. Based on the untainted facts disclosed in the affidavit, there was probable cause that McCormick was involved in the cultivation of marijuana and that McCormick would keep equipment, records or paraphernalia used in connection with this criminal activity at his residence. For all of these reasons, the court denies the defendant McCormick's motion to suppress (Dk.57).

**GOVERNMENT'S MOTION IN LIMINE (Dk.65).**

*A. Arguments*

The government seeks an order in limine denying the defendants' use of Ed Rosenthal as an expert witness. Ed Rosenthal has authored many books and articles concerning the use, cultivation and legalization of marijuana. He claims to have expertise in these areas. He co-founded the magazine, "High Times," and his column, "Ask Ed," regularly appears in it. His books and columns focus on growing marijuana and give advice on how to avoid detection by law enforcement. Rosenthal plainly advocates the use and legalization of marijuana. Rosenthal has appeared as an expert witness in marijuana cases dating back to 1987. Rosenthal's resume shows no college degrees or formal education in chemistry, botany, biology, or any other field related to the cultivation of marijuana. According to the government, Rosenthal "is a defense witness who will always testify that no matter how much marijuana an individual possessed, it was a personal use quantity." (Dk.65, p. 3).

From the premise that Rosenthal is plainly biased in favor of the use and legalization of marijuana, the government argues that "his

testimony would not only be a waste of the court's time, but also unduly prejudicial, due to Rosenthal's role as an advocate of marijuana." (Dk.65, p. 2). His lack of objectivity on marijuana's use and the governing laws makes it likely that the jury would be misled and confused by his testimony. In short, the government argues that the probative value of Rosenthal's testimony is substantially outweighed by its prejudicial nature and effect and that it should be excluded under Fed. R.Evid. 403. The government also contends that Rosenthal's testimony does not clear the reliability test enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). For the court's consideration, the government submits transcripts from other criminal proceedings where Rosenthal's testimony was admitted.

The defendant calls the government's motion "frivolous." (Dk.69, p. 1). The defendant equates the government's motion to a criminal defendant's effort to preclude a law enforcement officer from testifying because of his or her bias towards the enforcement of laws. The defendant highlights certain points of Rosenthal's testimony from *United States v. Wyman and Hadley*, No. 94–40038–01/02–RDR, including his opinion that the 178 marijuana plants, which the defendants were charged with possessing with the intent to distribute, would yield only 9.6 pounds of usable marijuana. The defendant insists the governments' attack against Rosenthal is, at best, a matter reserved for cross examination that goes to the weight of the evidence, not its admissibility.

At the hearing, the defendants agreed that the admissibility of Rosenthal's testimony was a matter that the court could decide from the record as submitted by the government, specifically the transcript of Rosenthal's testimony in *Wyman and Hadley*. By taking this position, the defendants waive their hearsay objections for purposes of this *in limine* proceeding. As far as Rosenthal's qualifications, the defendants point to several facts. First, Rosenthal has testified in other cases as an expert on "marijuana yield, intent, growing methods, and sophistication." (Dk.69, p. 5). Second, Rosenthal has written or co-authored seven books on marijuana with his first book, *Indoor/Outdoor Marijua-*

*na Grower's Guide,* published in 1974, selling over 600,000 copies. A later work, *Marijuana Grower's Guide, Deluxe Edition,* was published in 1978 and was favorably reviewed by the *New York Times.* Third, Rosenthal was asked by the co-director of a marijuana research project at the University of Mississippi, which assisted the Drug Enforcement Administration, to offer some advice on manicuring the marijuana. Fourth, he has advised other nations about marijuana or hemp fields. Fifth, the areas of Rosenthal's testimony in *Wyman and Hadley,* in the defendant's opinion, are matters plainly within his qualifications.

### B. Relevant Law

■■■ A district court has wide latitude in admitting or excluding expert testimony. *United States v. Onumonu,* 967 F.2d 782, 786 (2d Cir.1992). The court's discretion in determining the competency of an expert is broad. *United States v. Gomez,* 67 F.3d 1515, 1525 (10th Cir.1995), *cert. denied,* 516 U.S. 1060, 116 S.Ct. 737, 133 L.Ed.2d 687 (1996). The testimony of an expert must be relevant under Fed.R.Evid. 401, and its probative value must not be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403; *see United States v. Onumonu,* 967 F.2d at 786–87. Obviously, " 'there is often an inherent danger with expert testimony unduly biasing the jury "because of its aura of special reliability and trust.' " " *United States v. Boney,* 977 F.2d 624, 631 (D.C.Cir.1992) (quoting *United States v. Anderson,* 851 F.2d 384, 393 (D.C.Cir.1988) (quoting in turn *United States v. Amaral,* 488 F.2d 1148, 1152 (9th Cir. 1973)), *cert. denied,* 488 U.S. 1012, 109 S.Ct. 801, 102 L.Ed.2d 792 (1989)). The Supreme Court recently noted:

[A] judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules.... Finally Rule 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ...."

Judge Weinstein has explained: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." Weinstein, 138 F.R.D., at 632.

*Daubert v. Merrell Dow,* 509 U.S. at 594–96, 113 S.Ct. at 2797–98, 125 L.Ed.2d at 484 (1993).

Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. The rule of relevance governing expert testimony is Fed.R.Evid. 702, which provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

"[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert,* 509 U.S. at 589, 113 S.Ct. at 2795, 125 L.Ed.2d at 480. The court must decide "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. at 2796, 125 L.Ed.2d at 482. The trial judge performs a gatekeeping function in "determining whether it is reasonably likely that the expert possesses specialized knowledge" that will assist the jury in better understanding the facts at issue. *United States v. Sepulveda,* 15 F.3d 1161, 1183 (1st Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1223, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994). "[G]auging an expert witness's usefulness is almost always a case-specific inquiry." *Id.*

The court in *United States v. Rice,* 52 F.3d 843, 847 (10th Cir.1995), *cert. denied,* 518 U.S. 1011, 116 S.Ct. 2536, 135 L.Ed.2d 1058 (1996), quoted the following from the advisory committee's notes to Rule 702:

Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier. "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." (citations omitted).

It is well-recognized that expert testimony on the operations of drug dealers is appropriate, because these matters are not within the common knowledge of the average juror. *United States v. Boney,* 977 F.2d at 628. Explanations of drug packaging and whether amounts tended were consistent with personal consumption are subjects about which an average juror may not know. *United States v. Romero,* 57 F.3d 565, 571 (7th Cir.1995); *see also United States v. Taylor,* 18 F.3d 55, 60 (2d Cir.), *cert. denied,* 512 U.S. 1226, 114 S.Ct. 2720, 129 L.Ed.2d 845 (1994); *United States v. Muldrow,* 19 F.3d 1332, 1338 (10th Cir.) (specialized knowledge of law enforcement officer assisted jury in understanding the significance of the amount of cocaine possessed), *cert. denied,* 513 U.S. 862, 115 S.Ct. 175, 130 L.Ed.2d 110 (1994). The jargon used in the wholesale marijuana trade has "esoteric aspects reasonably perceived as beyond the ken of the jury." *United States v. Griffith,* 118 F.3d 318, 322–23 (5th Cir. 1997) (internal quotation omitted). The length of time it takes to grow a marijuana plant, the amount of marijuana it takes to make a cigarette and the amount of marijuana one could obtain from a single plant are matters that are likely to be outside the scope of most jurors' common knowledge and are properly within the realm of expert testimony. *United States v. Lennick,* 18 F.3d 814 (9th Cir.), *cert. denied,* 513 U.S. 856, 115 S.Ct. 162, 130 L.Ed.2d 100 (1994). "Expert testimony that a certain quantity of drugs suggests distribution is admissible." *United States v. Hunter,* 95 F.3d 14, 17 (8th Cir. 1996) (citation omitted).

In cases where the proffered expert relies on some principle or methodology, a court should undertake a reliability evaluation that

includes the following non-exhaustive list of factors: "whether the theory or technique has been tested, subjected to peer review or publication, is generally accepted within the relevant scientific community, or has a known or potential rate of error," *Compton v. Subaru of America, Inc.*, 82 F.3d 1513, 1518 (10th Cir.) (citing *Daubert*, 509 U.S. at 591–95, 113 S.Ct. 2786),, *cert. denied*, —— U.S. ——, 117 S.Ct. 611, 136 L.Ed.2d 536 (1996), and whether standards controlling the technique's operation exist and are maintained, *United States v. Call*, 129 F.3d 1402, 1404 (10th Cir.1997) (citation omitted). The focus in evaluating these factors rests upon " 'the principles and methodology, not on the conclusions that they generate.' " *Compton*, 82 F.3d at 1518 (quoting *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786). " 'General acceptance' of principal underlying scientific evidence is not a precondition to the admissibility of expert evidence under the Federal Rules of Evidence." *United States v. Muldrow*, 19 F.3d at 1337 (citation omitted).

In any case where expert testimony is proffered, the trial judge has the gatekeeping function of determining whether the testimony is not only relevant, but reliable. *United States v. Thomas*, 74 F.3d 676, 681 (6th Cir.), *cert. denied*, 517 U.S. 1162, 116 S.Ct. 1558, 134 L.Ed.2d 659 (1996). In a case where the expert testimony "is based solely upon experience or training," the individual *Daubert* factors are unnecessary, but the trial judge still must "make a preliminary finding that proffered expert testimony is both relevant and reliable." *Compton*, 82 F.3d at 1518–19.

■■■ The court appreciates that one can be an expert by reason of experience and knowledge acquired on the job. In *United States v. Carswell*, 922 F.2d 876 (D.C.Cir. 1991), the defendant, charged with possession of cocaine base with the intent to distribute, sought to introduce the testimony of an purported expert on drug abuse. The defendant proffered that the expert would testify that the amount of cocaine found in his home and its packaging were consistent with personal use and that cocaine addiction can cause weight loss and erratic work loss, both of which were experiences that the defendant testified he had experienced. The district court excluded the testimony finding that the expert was not qualified. The expert was

the publisher of a newsletter of marijuana and the former national director of the National Organization for the Reform of Marijuana Laws ("NORML"). The expert also had worked eight years in a store that sold drug paraphernalia to both marijuana and cocaine users. He had testified twice as an expert on drug abuse and spoken at different seminars and conferences on drug abuse. The appeals court upheld the district court's ruling finding that it was "unclear why" his work at NORML and at a drug paraphernalia store "would entail knowledge concerning the packaging and the distribution practices of cocaine dealers in the District [of Columbia]." 922 F.2d at 878. The court observed:

> While an expert need not necessarily have particular academic credentials, (citation omitted), most cases upholding a trial court's decision to qualify an expert on the basis of practical experience have involved knowledge gained in something more than a casual manner, or knowledge upon which the witness or others relied in a context independent of the courtroom.
>
> . . . . We note that in the cases the defendant cites regarding expert qualification, the witness appears to have acquired the claimed expertise not casually but purposefully in connection with his or her vocation.
>
> . . . . We do not suggest that only expertise acquired for professional purposes may be recognized under Rule 702. Rather, the point is that the way in which the witness acquired the· expertise is significant in assessing whether he is likely to have acquired accurate and reliable knowledge. The knowledge that Gettman claims to have acquired was at most incidental to his employments. In essence, he is claiming to have been an observant person who was employed in activities that might have enabled a keen observer to learn something about the subjects at issue in this case.

922 F.2d at 878–79.

In *United States v. Johnson*, 575 F.2d 1347 (5th Cir.1978), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1213–14, 59 L.Ed.2d 454 (1979), the government called an expert to testify on the origin of the marijuana. In voir dire, the

expert admitted that he had smoked marijuana over a thousand times and that he had dealt in marijuana as many as twenty times. The expert said he had been asked to identify marijuana over a hundred times and had done so without mistake. "[H]is qualification came entirely from 'the experience of being around a great deal and smoking it.'" 575 F.2d at 1360. The circuit observed that "the source of the marijuana, is related to the occupation of selling illegal drugs and to the science of botany, neither of which is likely to be within the knowledge of an average juror." 575 F.2d at 1361. The circuit agreed that the expertise may be obtained by experience as well as from formal training or education. *Id.*

■ "An expert witness's bias goes to the weight, not the admissibility of the testimony, and should be brought out on cross-examination." 4 *Weinstein's Federal Evidence* § 702.06[8], p. 702–45 (1997). Bias goes to weight rather than qualifications. *Id.* at n. 35. · Thus, a party who is otherwise qualified as an expert may testify as an expert witness in his own case regardless of concerns that the party is plainly self-interested. 3 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 349, p. 606–07 (2d ed.1994); *see, e.g. Scheidt v. Klein,* 956 F.2d 963, 968 (10th Cir.1992). Impartiality is not a requirement for being an expert witness under the current rules of evidence. *United States v. Williams,* 81 F.3d 1434, 1441 (7th Cir.1996).

On the other hand, there is a line of cases which have held that "'where an expert becomes an advocate for a cause, he therefore departs from the ranks of an objective expert witness, and any resulting testimony would be unfairly prejudicial and misleading.'" *Conde v. Velsicol Chemical Corp.,* 804 F.Supp. 972, 984 (S.D.Ohio 1992) (quoting *Viterbo v. Dow Chemical Co.,* 646 F.Supp. 1420, 1425–26 (E.D.Tex.1986) (citing *Johnston v. United States,* 597 F.Supp. 374 (D.Kan.1984)), *aff'd,* 826 F.2d 420 (5th Cir. 1987)), *aff'd,* 24 F.3d 809 (6th Cir.1994); *see also In re Air Crash Disaster at Detroit Metro. Airport,* 737 F.Supp. 427, · 430 (E.D.Mich.1989), *aff'd,* 917 F.2d 24 (6th Cir. 1990) (Table). In these cases, the critical facts were that the experts had affirmatively sought employment from the plaintiffs and

that the experts had preconceived notions before the litigation commenced.

## C. Analysis

■ After carefully reading and considering the more than 400 pages of transcript involving Rosenthal's testimony in *United States v. Wyman and Hadley,* the court believes it is in a position where it can perform the gatekeeping function required by *Daubert* and Rule 702. The court also is mindful that the party offering the expert testimony has the burden of laying a foundation for its admission. *United States v. Williams,* 95 F.3d 723, 729 (8th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 750, 136 L.Ed.2d 687 (1997).

■ " 'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.'" *United States v. Diallo,* 40 F.3d 32, 34 (2d Cir.1994) (quoting *United States v. Lewis,* 954 F.2d 1386, 1390 (7th Cir.1992)). Making this comparison based on Rosenthal's testimony in *Wyman and Hadley,* the court observes several areas where Rosenthal's purported testimony extends beyond his demonstrated areas of specialized knowledge.

The first step is defining the areas of Rosenthal's demonstrated expertise. The court admits to having substantial difficulty with this task. That Rosenthal writes books on marijuana growing and regularly writes a popular advice column for *High Times* tells the court nothing about the scientific reliability of his opinions expressed therein. There is no evidence that any of Rosenthal's writings on marijuana have even been recognized as a valid research effort or reference book in the field of botany. Nor is there anything of record that would lead this court to believe that it should rely on readers of *High Times* or others having an interest in growing marijuana as a valid indicator of reliability.

As far as Rosenthal's expert witness status in other cases, the court has been furnished the records from only two of those proceedings. In *State v. Hood,* the court found that

Rosenthal's testimony on the growing of marijuana was a " serious disappointment" and could not be trusted. "[H]is [Rosenthal's] testimony was ideologically driven to the point where I [Judge Nelson] think he had no objectivity at all." (Trans.Aug. 20, 1993, p. 171). In *Wyman and Hadley*, Judge Rogers in the following excerpts from that trial expressed his serious reservations with Rosenthal's qualifications:

> My only problem is with this man's qualifications to come in and make these general observations from what he's looked at there and talk about a Mississippi study and other studies, we have no idea what marijuana was there.... I am just having trouble getting his qualifications to come in and draw this complicated chart and make these findings.
>
> . . . .
>
> I also have the problem with this general study based on the relevant conclusions, but I tell you what I'm going to do. It's difficult for me. I've accepted him as an expert, which in the first place was difficult—very difficult to do because of the lack of really certain qualifications, but I'm going to· allow you to go ahead and present this, and you'll have to cross-examine about it, but it's a little far stretch of the imagination. That's my problem. It's almost voodoo research we're talking about here.

(Trans. January 27, 1995, pp. 98–100). The court does not have any knowledge of these other cases or what areas that Rosenthal was recognized as a expert.

Based on the transcript from *Wyman and Hadley* and the affidavit of Dr. Mahmoud A. ElSohly, the Director of the Marijuana Project at the University of Mississippi since 1980, it is an overstatement to say that Rosenthal ever served as a consultant to the Marijuana Project at the University of Mississippi. At most, Rosenthal may have visited the project prior to 1980 and offered some of the researchers advice on manicuring the marijuana plants, *i.e.* separating the buds from the rest of the plant. The court cannot tell from Rosenthal's testimony that the matters on which he offered advice to this project or to the foreign countries of India and Hungry covered the same areas on which he would testify here.

From all that is of record, the court's impression is that Rosenthal's qualifications are largely a matter provable only through his own opinion of himself. He lacks any academic background, formal education or training, and experience that would qualify him as an expert on the subject of growing, harvesting, and processing of marijuana. His unique exposure to these topics is limited to his self-directed efforts at reading reference works, talking with some researchers and growers, and then summarizing the work of others into popular "how-to" guides. Before it can conclude that Rosenthal's testimony is reliable as a result of these self-directed efforts, there must be a foundation from which the court can find that Rosenthal has the training or background for such research and that Rosenthal's methods for conducting this research were reliable. The court is not persuaded from reading the transcript in *Wyman and Hadley* that this foundation has been laid.

 Even assuming that such a foundation is laid and Rosenthal is able to demonstrate a specialized knowledge concerning the marijuana plant and the cultivation and growing of it, the court would not allow Rosenthal to testify on the issues of yield and intent based on the foundation made in *Wyman and Hadley*. Except for his initial premise taken from Dr. ElSohly's work that a marijuana plant would yield 237 grams of usable marijuana, Rosenthal's testimony does not appear to be based on any information of a type reasonably relied upon by experts in that field. While Rosenthal offers what he believes are "conservative estimates," without a factual basis for them, they are nothing short of arbitrary opinions. " 'An expert's opinion is helpful only to the extent the expert draws. on some special skill, knowledge, or experience to formulate [his] opinion; the opinion must be an *expert* opinion (that is, an opinion informed by the witness's expertise) rather than simply an opinion broached by a purported expert.' " *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir.1996) (quoting *United States v. Benson*, 941 F.2d 598 (7th Cir.1991)).

As for the general practices of outdoor marijuana growers, the court also finds an

inadequate foundation for Rosenthal's testimony on this subject. Just saying you've talked with "many" outdoor growers does not make one an expert on the general practices of outdoor growers in Kansas. Rosenthal offers nothing to suggest that the growers with whom he talked are a representative sample of marijuana growers. For that matter, Rosenthal does not explain why those growers' practices would be the same ones followed in Kansas. Rosenthal has never seen marijuana growing outdoors in Kansas and has never studied specifically the outdoor growing practices in Kansas. "Evidentiary reliability, or trustworthiness, is demonstrated by a showing that the knowledge offered is more than speculative belief or unsupported speculation." *United States v. Posado*, 57 F.3d 428, 433 (5th Cir.1995) (internal quotation omitted).

Additionally, Rosenthal's testimony in *Wyman and Hadley* on the processing and use of marijuana in Kansas would not be admissible in this case without proof that it is based on information of a type reasonably relied upon by an expert in the field. The record does not demonstrate that Rosenthal has even seen marijuana that he knew to be grown and processed in Kansas. Rosenthal does not opine nor offer a factual basis for opining that the processing and the use of marijuana in Kansas is the same as in other states where he may have had the opportunity to observe such practices. Even Rosenthal's testimony on what he knows about such practices in general does not appear to be based on information that would be considered reasonably reliable by others. In *Wyman and Hadley*, Rosenthal offered his opinion in this regard and admitted that it was based principally on his conclusions drawn from letters written to him as an advice columnist for *High Times*. The defendants offer the court no legal or factual basis for finding that such letters are the kind of information on which an expert on marijuana usage in Kansas would reasonably rely.

Finally, the court admits its scrutiny of Rosenthal's qualifications and the foundation for his opinions exceeds that normally applied at the *in limine* stage. This is due largely to the available transcript of Rosenthal's testimony in a case from this district involving similar charges. While the court believes that Rosenthal's obvious impartiality and bias towards those charged with marijuana offenses do not disqualify him from becoming an expert, the court believes Rosenthal's self-created advocacy role can be just cause for taking more care in determining his qualifications, the relevance and reliability of his opinions, and the factual foundation for his opinions. For all of these reasons, the court sustains the government's motion in limine insofar as it will not allow Rosenthal to testify as an expert on the subjects discussed above if the qualifications elicited and foundations laid are no more than those made in *Wyman and Hadley*.

IT IS THEREFORE ORDERED that the defendant McCormick's motion to suppress items seized from McCormick/Sloan residence (Dk.57), and motion to dismiss charges and/or to suppress evidence found in motor vehicle or residence (Dk.59) are denied;

IT IS FURTHER ORDERED that government's motion in limine (Dk.65) is granted to the extent discussed above;

IT IS FURTHER ORDERED that the government's motion to have its limine motion decided upon the briefs (Dk.75) is denied as moot.