# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

Nos. 98-1039/2792

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| LAURA TAYLOR, | * | |
| | * | |
| Appellant. | * | |

_____

Nos. 98-1041/2555

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | [UNPUBLISHED] |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| JAMES TAYLOR, | * | |
| | * | |
| Appellant. | * | |

Appeals from the
United States District Court
for the Eastern District of
Arkansas, Western Division

_____

Submitted: June 8, 1998
Filed: August 24, 1998

_____

Before RICHARD S. ARNOLD and MORRIS SHEPPARD ARNOLD, Circuit Judges, and PANNER[1], District Judge

_____

PANNER, District Judge.


Laura and James Taylor appeal their convictions and sentences for conspiracy to manufacture methamphetamine. They challenge the sufficiency of the evidence and raise various pretrial, evidentiary, and sentencing issues. Additionally, they each appeal, pro se, from the denial of post-appeal motions to dismiss the indictment. We affirm.


## BACKGROUND

In August 1995, Mark Tubbs, a North Little Rock police officer assigned to a federal Drug Enforcement Agency (DEA) task force, learned of Laura Taylor's order for 2500 grams of phenylacetic acid, a precursor chemical used to manufacture methamphetamine. Tubbs obtained the substance and, with Special Agent James Boyce, made a controlled delivery of it to the Taylors. The agents informed Laura Taylor of the nature of the chemical and asked if she had a legitimate use for it. Laura Taylor told them that she was using it to make perfume.


The agents examined the residence and found no evidence of perfume manufacturing such as bottles, labels, or other equipment. Because Boyce and Tubbs determined that the Taylors had no legitimate reason to possess the phenylacetic acid, they kept the substance and began proceedings to forfeit it under 21 U.S.C. § 881(a)(2). These proceedings culminated in the substance's destruction after the DEA released it to a private waste disposal firm in June 1996.

---

[1]The Honorable Owen M. Panner, United States District Judge for the District of Oregon, sitting by designation.

In December 1995, the Taylors met with Stephen Rodriguez, a research assistant at the University of Arkansas in Little Rock. Rodriguez has degrees in chemistry and responded to the Taylors' advertisement for assistance with perfume manufacturing. The Taylors told Rodriguez that they had problems possessing phenylacetic acid and asked him if he would obtain the substance for their use. They also discussed what equipment would be required to manufacture perfume. Rodriguez believed that the Taylors had no facilities for making perfume. He and the Taylors made no future meeting date. Rodriguez expected that the Taylors would do the necessary groundwork in pursuit of the required license. This never occurred.

In January 1996, Laura Taylor met with DEA agent William Bryant regarding the confiscated phenylacetic acid. She gave him a perfume formula at that time. Although she had previously told Bryant that she had a patent for the formula, she never produced one. Bryant told her that the DEA needed to view her production premises and reminded her that she needed a license for the substance. She refused to show Bryant any premises. The day after meeting with Laura Taylor, Bryant learned that the Taylors' phenylacetic acid license application had been rejected.

In February 1996, Roger Case, a narcotics investigator with the Little Rock Police Department who works with the DEA, began investigating James Taylor's involvement with illegal drug activities. As part of that investigation, Jerrell Allen Parker, James Taylor's half-brother, secretly tape-recorded several conversations between James Taylor and himself in the spring of 1996. The tape recordings were played for the jury. Laura Taylor participated in at least one conversation in which Parker and the Taylors discussed obtaining phenylacetic acid in order to make methamphetamine. Parker also testified that in June 1996, James Taylor asked Parker to get rid of some methamphetamine for him.

Steve Clemmons, a drug supervisor with the Arkansas State Police, participated in the investigation. In an undercover role, he met with James Taylor who expressed

a desire to purchase phenylacetic acid and who agreed to try to pay Clemmons partially in cash and partially in methamphetamine. James Taylor never told Clemmons that he wanted to produce perfume. James Taylor expressed knowledge about manufacturing methamphetamine and the different "grades" of phenylacetic acid.

A couple of weeks later, James Taylor called Clemmons and expressed concern that Clemmons was an undercover law enforcement officer. Clemmons responded that the next time he was in town, they would talk about the problem. Clemmons did not contact James Taylor again.

On July 9, 1996, Case and several other officers executed a search warrant at the Taylors' residence. Agents seized several items involved in the methamphetamine manufacturing process including a large number of hydrogen peroxide bottles, ether, flasks, reaction vessels, Zarcol solvent alcohol, cans of trichlorethylene and acetone, and flasks containing liquid residue. Books entitled "The Anarchist's Cookbook" and "Recreational Drugs" were found, as was a green notebook containing chemical formulas, or partial formulas, for the manufacture of precursors used in making methamphetamine. James Taylor's fingerprints were found on assorted items of glassware recovered from the residence during the search, some of which contained chemicals associated with the methamphetamine manufacturing process.

Nick Dawson, a drug chemist for the Arkansas State Crime Laboratory, testified that the items seized from the Taylors' residence showed the presence of methamphetamine and of precursor chemicals to manufacturing methamphetamine by the hydriotic acid-red phosphorous method. Dawson also explained that only very small amounts of phenylacetic acid are needed for its legitimate uses such as perfume manufacturing, the making of a penicillin-type drug, and the making of a few fertilizers and herbicides.

DISCUSSION

I. Motion to Sever

Laura Taylor appeals from the district court's denial of her motion to sever which we review for an abuse of discretion. United States v. Jones, 16 F.3d 275, 279 (8th Cir. 1994). If a defendant will be prejudiced by joinder with co-defendants for trial, the court may grant a severance. Fed. R. Crim. P. 14. However, when the charges against co-conspirators are based on the same acts or evidence, they are ordinarily tried together. United States v. Wint, 974 F.2d 961, 965-66 (8th Cir. 1992). A defendant can show such prejudice either by showing that his "defense was irreconcilable with that of his codefendant or that the jury was unable to compartmentalize the evidence." United States v. Bordeaux, 84 F.3d 1544, 1547 (8th Cir. 1996).

We reject Laura Taylor's argument that the jury was unable to compartmentalize the evidence in this case. Two defendants were tried on a one-count indictment with straightforward evidence and testimony. Although the jury learned that Laura and James Taylor were married, lived together, and had a child, these facts were insufficient to confuse the jury as to the evidence against Laura Taylor as a separate defendant. The evidence that directly implicated only Laura Taylor consisted of actions taken regarding the order of the phenylacetic acid and her participation in a conversation to obtain the substance to make crystal methamphetamine. This was uncomplicated and easy to separate from other evidence presented in the case.

The evidence that directly implicated only James Taylor consisted of additional conversations with Parker, statements to Clemmons, and fingerprints on glassware containing methamphetamine and precursor chemical residue, among other things. This also was easily segregated. There was no prejudicial spillover. The district court did not abuse its discretion in denying the severance motion.

-5-

II. Sufficiency of the Evidence

We view the evidence in the light most favorable to the jury verdict. United States v. Moore, Nos. 97-2603, 97-2605, 1998 WL 337961, at *1 (8th Cir. June 26, 1998). A conviction will be reversed for insufficient evidence only if a "reasonable fact-finder must have a reasonable doubt about an essential element of the offense." United States v. Spence, 125 F.3d 1192, 1193 (8th Cir. 1997), cert. denied, 118 S. Ct. 1544 (1998). To prevail in a conspiracy trial, the government must prove that there was an agreement to achieve some illegal purpose, that the defendant knew of the agreement, and that the defendant knowingly became a part of the conspiracy. United States v. Bass, 121 F.3d 1218, 1220 (8th Cir. 1997).

A. Laura Taylor

The jury learned that Laura Taylor ordered the phenylacetic acid in an amount large enough to raise suspicion and inconsistent with the amounts normally used for legitimate purposes. She was unable to produce either a patent for a formula or a license for the chemical. She never showed the agents her perfume manufacturing location. The jury could infer that she attempted to bring Rodriguez into the scheme as a source of legitimacy in hopes that he could obtain the substance and a license for it. She was unable to show either the agents or Rodriguez that she possessed the facilities or the knowledge to manufacture perfume.

Laura Taylor also participated in at least one conversation with James Taylor and Parker in which they discussed a recipe for manufacturing methamphetamine and the need to locate phenylacetic acid. We agree with the district court that the evidence was sufficient to support the verdict.

B. James Taylor

James Taylor challenges the admission of Parker's testimony and the admission of Parker's statements as related through Case because there was insufficient proof that he (Taylor) was involved in a conspiracy. He argues that the district court should have

excluded Parker's statements and that without them, there is insufficient evidence to sustain his conviction.

We first address Parker's direct testimony and his statements on the tapes that were played for the jury. Any out-of-court statements made by one of the defendants and played on the tapes or testified to by Parker, including Parker's testimony that James Taylor asked Parker to get rid of some methamphetamine for him, were non-hearsay admissions, admissible under Federal Rule of Evidence 801(d)(2)(A).

Under Federal Rule of Evidence 801(d)(2)(E), a co-conspirator's out-of-court statement is not hearsay if "the trial court is convinced by a preponderance of the evidence that the challenged statement was made during the course and in furtherance of a conspiracy to which the declarant and the defendant were parties." United States v. Moss, 138 F.3d 742, 744 (8th Cir. 1998). Statements made in furtherance of a conspiracy "'must somehow advance the objectives of the conspiracy, not merely inform the listener of the declarant's activities.'" Id. (quoting United States v. DeLuna, 763 F.2d 897, 909 (8th Cir. 1984)).

In making the preliminary factual determination under Rule 801(d)(2)(E), the court may examine the hearsay statements sought to be admitted. Bourjaily v. United States, 483 U.S. 171, 181 (1987). We review the district court's decision to admit co-conspirator testimony under Rule 801(d)(2)(E) for clear error. Moss, 138 F.3d at 744.

Based on the evidence recited earlier, we conclude that the district court correctly determined that the evidence established a conspiracy among James Taylor, Laura Taylor, and Parker to manufacture methamphetamine. Thus, Parker's statements made before trial and played for the jury on the tapes, were properly admitted as non-hearsay statements of a co-conspirator under Rule 801(d)(2)(E).

We next consider Parker's statements related by Case. Case testified that in a July 1996 interview with himself and Boyce, Parker said (1) that James Taylor had told Parker that Taylor was manufacturing methamphetamine using ephedrine; (2) that Parker had observed Laura and James Taylor each with an ounce of methamphetamine in the preceding month; and (3) that Parker had observed methamphetamine manufacturing equipment at the Taylors' residence. As to the first of these three statements, there are two levels of hearsay at issue: James Taylor's statement to Parker and Parker's reiteration of that statement to Case. While James Taylor's statement to Parker is a non-hearsay admission of a party-opponent, the issue is whether any of Parker's statements to Case are admissible.

Although Rule 801(d)(2)(E) does not require that the statement be made to another co-conspirator, see, e.g., United States v. Krevsky, 741 F.2d 1090, 1095 (8th Cir. 1984)(statement to informant), "conspirator statements to a known police agent are admissible under Rule 801(d)(2)(E) only if intended to allow the conspiracy to continue, for example, by misleading law enforcers." United States v. Alonzo, 991 F.2d 1422, 1426 (8th Cir. 1993). Parker's statements to Case and Boyce, including his reiteration of the statement made to him by James Taylor, and testified to by Case, were not made with the intent of continuing the conspiracy. They are hearsay and it was error to admit them.

An evidentiary error amounts to harmless error only if, after viewing the entire record, the reviewing court determines that no substantial rights of the defendant were affected, and that the error had no, or only slight, influence on the verdict. United States v. DeAngelo, 13 F.3d 1228, 1233 (8th Cir. 1994); Fed. R. Crim. P. 52(a). In this case, we believe the error of admitting these statements was harmless. We further conclude that the admissible evidence was sufficient to support the verdict.

III. Trial Proceedings

While Parker was testifying, the government played tapes of his conversations with James and Laura Taylor. While the tapes played, the jury followed along with transcripts prepared by the government. The tapes were admitted into evidence; the transcripts were not. Generally, counsel for the government played part of a tape, then stopped it to ask Parker some clarifying questions, then continued playing a tape. This occurred throughout Parker's testimony.

The parties represent that James Taylor is heard on the tape stating "I'm going to tell you my lawyer is looking at it. Is that I piss clean and get my job right after they arrested me. I have had my job. I have kept my job." He also made a statement about "coming up to court here in May."[2] These statements were also in the accompanying transcripts given to the jury while the tapes were played.

Defense counsel objected to this testimony as prejudicial and moved for a mistrial. The district court denied the motion and defense counsel refused the district court's offer to give the jury a cautionary instruction to disregard the testimony. During a recess, counsel for the government highlighted the portions of the transcripts corresponding to the relevant parts of the tapes.

When the jury returned, the district court instructed them as follows:

Ladies and gentlemen, as you have seen, there are typewritten transcripts of the tape recordings that you're hearing. The transcripts also undertake

---

[2] Although we attempted to listen to the tapes to hear the disputed statements firsthand, the tapes were apparently redacted of some the objectionable material before going to the jury. Thus, while we heard the court-related statement, we were unable to verify the accuracy of the other statements. The source of our quote is from the trial transcript when the district court read the transcript accompanying the tapes during a sidebar conference with counsel.

to identify the speakers engaged in the conversation. You were permitted to have the transcripts for the limited purpose of helping you follow the conversation as you listen to the tape recording and also to help you keep track of the speakers. The transcripts, however, are not evidence. The tape recording itself is the primary evidence of its own contents. Differences in meaning in what you heard in the recording and what you may have read in the transcript may be used by such things as an inflection in the speaker's voice. You should rely on what you hear rather than what you read if you perceive there to be any difference at all.

Later in the trial and using the same procedure, the jury listened to tapes of Clemmons's discussions with James Taylor. The transcript of these tapes showed James Taylor using a racial slur. Finally, of additional concern to James Taylor is Case's testimony, in response to Laura Taylor's counsel's request that he read a particular entry from a calendar found at the Taylors' residence, that "[o]n August 1 it shows Sonny court, Pope County, 1:00 P.M." James Taylor was known as Sonny.

We review the district court's denial of a motion for a mistrial for an abuse of discretion. United States v. Hale, 1 F.3d 691, 694 (8th Cir. 1993). The prejudicial effect of any improper testimony on a defendant's right to a fair trial is determined by examining the trial context of the error and the prejudice it created with the strength of the evidence against the defendant. United States v. Flores, 73 F.3d 826, 832 (8th Cir.), cert. denied, 116 S. Ct. 2568 (1996). Even if an error has been committed, a curative instruction often suffices to correct any undue prejudice. United States v. Rhodenizer, 106 F.3d 222, 225 (8th Cir. 1997).

We agree with the district court that the improper testimony did not create a prejudice which the offered limiting instruction could not have cured. The comments at issue were ambiguous. The reference on the tapes to a court date could have been to anyone's court date or to a civil issue. The testimony regarding "Sonny's" upcoming court date could also have been referring to a civil matter. It is far from certain that the

jury would have understood the words "I piss clean" to mean a urinalysis. Even if it did, because James Taylor also discusses keeping his job, he could have been mentioning an employment-related urinalysis.

The evidence against James Taylor was convincing. Furthermore, even if there had been prejudice created by the testimony, it could have been corrected by the curative instruction.

As to the use of the transcripts which were not admitted into evidence, James Taylor only speculates that the jury was exposed to the racial epithet. The words were not highlighted on the transcript and they were not played on the tape. The jury would have had to read ahead of where the tape was playing to see the remark. The transcripts were not admitted into evidence. The trial court instructed the jury that the transcripts were not evidence and to rely only on the tapes themselves. The transcripts were taken from the jury as soon as the relevant testimony concluded.

We are unpersuaded that the jury's receipt of the transcript created undue prejudice against James Taylor.

IV. Sentencing

A. Drug Quantity

At sentencing, Arkansas State Crime Laboratory chemist Nick Dawson testified that 211.6 grams of d-pseudoephedrine were present at the Taylors' residence and that practically, 105 to 169 grams of methamphetamine could have been made from this gross amount. The district court determined that James Taylor was responsible for at least 105 grams of actual methamphetamine, resulting in a base offense level of 32.

The government must prove the quantity of drugs by a preponderance of the evidence. United States v. England, 966 F.2d 403, 409 (8th Cir. 1992). We review the

district court's determination of drug quantity for sentencing purposes for clear error. United States v. Hiveley, 61 F.3d 1358, 1362 (8th Cir. 1995).

Dawson's testimony established that a 50% yield was 105 grams.  James Taylor mistakenly calculates the 50% yield from Dawson's 194-gram theoretical yield figure rather than the 211.6-gram gross amount.  Additionally, under the United States Sentencing Guidelines for relevant conduct, there was sufficient evidence to hold James Taylor responsible for the 105 grams of methamphetamine.  See U.S.S.G. § 1B1.3(a)(1)(A)-(B) (1997).

### B.  Downward Departure

The district court denied motions by Laura and James Taylor for a downward departure based on exceptional family circumstances.  In reviewing the transcript of the sentencing hearing, it is clear that the district court correctly determined that it had authority to consider a departure based on family circumstances for each defendant, but declined to do so.  We have no jurisdiction to review this determination.  United States v. Saelee, 123 F.3d 1024, 1025 (8th Cir. 1997).

### V.  Pro Se Appeal of Post-Appeal Motions

Following the filing of appeals in these cases, both Laura and James Taylor filed pro se motions to dismiss the indictment in the district court.  In addition, James Taylor also moved, pro se, to dismiss his attorney.  The district court denied these motions because it lacked jurisdiction to consider them.  The district court also denied motions to reconsider that denial.

In appeal numbers 98-2792 and 98-2555, Laura Taylor and James Taylor appeal, respectively, and pro se, the denial of these motions.  We affirm.

Once the notices of appeal were filed, the district court was divested of jurisdiction over those aspects of the case involved in the appeal.  In re Grand Jury

-12-

Subpoenas Duces Tecum, 85 F.3d 372, 375 (8th Cir. 1996).  James Taylor's motion to dismiss counsel, who represents him in the primary appeal, is involved in the appeal. The motions to dismiss the indictment are sufficiently related to the heart of the case on appeal.  In any event, as discussed below, we affirm the denials of these motions on their merits.

VI.  Pro Se Motions
    A.  Motions to Dismiss Indictment
    After receiving the district court's orders denying their motions to dismiss the indictment and James Taylor's motion to dismiss his counsel, the Taylors filed similar motions to dismiss here in this court.  They argue that the indictment must be dismissed for failure to charge an offense other than 21 U.S.C. § 846, which they maintain is a mere penalty statute and not a substantive offense.  We disagree.

    The superseding indictment in the instant case charged that

    [o]n or about August 1, 1995 and continuing thereafter through on or about July 31, 1996, in the Eastern District of Arkansas, LAURA TAYLOR and JAMES G. TAYLOR did knowingly and intentionally conspire to manufacture methamphetamine[,] a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846.

First, the indictment is a "plain, concise and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  Second, it fairly informed the Taylors of the charge against them which they had to defend and it will enable them to plead double jeopardy as a bar to further prosecution.  United States v. Diaz-Diaz, 135 F.3d 572, 575-76 (8th Cir. 1998).  Third, we note that "an indictment for conspiring to commit an offense in which the conspiracy is the gist of the crime" may be less technically precise than an indictment for the substantive offense.  United States v. Starr, 584 F.2d 235, 237 (8th Cir. 1978)(citing Wong Tai v. United States, 273 U.S. 77, 81 (1927)).

-13-

Under these standards, the indictment was sufficient. Although citation to 21 U.S.C. § 841(a)(1), outlawing the manufacture of a controlled substance, was not required, even if it were, no prejudice to defendants occurred by its omission. Fed. R. Crim. P. 7(c)(3); cf. United States v. Padilla, 869 F.2d 372, 381 n.5 (8th Cir. 1989)(no prejudice to defendant under Rule 7(c)(3) when indictment charged only penalty provisions of section 841(b)(1)(A)(ii) rather than substantive provision of section 841(a)).

B.      "Demand for Suspension of the Rules, and Demand for Preliminary Proceeding"

The Taylors each filed the above-entitled document challenging the subject matter jurisdiction of both the district court and this court. This argument has no merit. U.S. Const. art. III, § 1, cl. 1 (granting Congress the power to ordain and establish inferior federal courts); 18 U.S.C. § 3231 (vesting original jurisdiction of all offenses against the laws of the United States in the district courts); 28 U.S.C. § 1291 (vesting jurisdiction of all appeals from final decisions of the district courts in the courts of appeals).

Affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.